**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**William C. BIBBS, Appellant.**

Superior Court of Pennsylvania.

Submitted Jan. 5, 2009.

Filed April 7, 2009.

James A. Daringer, Shillington, for appellant.

Jonathan H. Kurland, Asst. Dist. Atty., Reading, for Commonwealth, appellee.

BEFORE: MUSMANNO, BENDER and CLELAND, JJ.

OPINION BY BENDER, J.:

¶ 1 William C. Bibbs appeals from the January 2, 2007 judgment of sentence of an aggregate of fourteen to thirty years' incarceration imposed following his convictions for robbery (18 Pa.C.S. § 3701(a)(1)(i)), conspiracy to commit robbery (18 Pa.C.S. § 903(a)(1)), two counts of aggravated assault (18 Pa.C.S. § 2702(a)(1), (4)), two counts of conspiracy to commit aggravated assault (18 Pa.C.S. § 903(a)(1)), firearms not to be carried without a license (18 Pa.C.S. § 6106(a)(1)),

conspiracy to commit firearms not to be carried without a license (18 Pa.C.S. § 903(a)(1)), possession of an instrument of crime (18 Pa.C.S. § 907(a)), and conspiracy to commit possession of an instrument of crime (18 Pa.C.S. § 903(a)(1)).[1] We affirm.

¶ 2 The trial court set forth the following facts of the instant case in its opinion filed pursuant to Pa.R.A.P.1925(a):

On December 4, 2005, Officer Paul Reilly of the City of Reading Police Department was the first officer to arrive at a crime scene outside the Renaissance Bistro at 550 North Third Street, City of Reading, Berks County, Pennsylvania. He arrived very early in the morning, within approximately two minutes of receiving a report of a shooting from dispatch. He arrived moments prior to emergency medical services. When Officer Reilly arrived, the victim, Martin Phillips, was sitting on the sidewalk with assistance from another individual. Mr. Phillips appeared to be upset and in pain. Officer Reilly asked Mr. Phillips who had shot him, but reserved all other questioning until later. Mr. Phillips immediately responded that a man he knew as Bill had shot him.

On December 6, 2005, Criminal Investigators William Strickler and Madison Winchester interviewed the [victim] at the hospital. C.I. Strickler described Mr. Phillips as in a lot of pain, but very sure of himself, and completely conscious at the time of the interview. Mr. Phillips described to the officers how he and a friend had left the Renaissance and were approached by Ant and Bill. After the friend ran, Mr. Phillips was robbed by Ant and Bill. As Mr. Phillips turned to leave, he heard Bill call him a derogatory term, saw Bill began [sic] to

---

1. Appellant was found not guilty of attempted murder and the related conspiracy charge.

take his hand out of his pocket, heard a gunshot, and immediately felt the bullet hit him. The bullet lodged in or near his spinal cord. C.I. Strickler showed two photographs to Mr. Phillips. In response to the first photograph, Mr. Phillips indicated that was the shooter, Bill, and in response to the second, he indicated that was Ant, the individual who robbed him. The first photograph was a photograph of the defendant. Both Mr. Phillips and C.I. Strickler signed the photographs.

At the jury trial on July 12, 2006, testimony began with Mr. Phillips, who had also testified at the preliminary hearing and then reluctantly testified at the pretrial hearing. During the jury trial, Mr. Phillips stated that he did not want to testify because the person who shot him was not in the courtroom. However, he stated that he did not know who shot him. He did testify that he was at the Renaissance Bistro at 550 North Third Street on December 4, 2005, observed an altercation, and was shot. Mr. Phillips stated that the defendant was nowhere near that location at that time. He did not remember being robbed, but did recall that he was shot in the back. He did not recall his injuries except that his bowels were paralyzed for three months after the incident, he was numb, and could barely walk.

The Assistant District Attorney Joseph Speece, showed Mr. Phillips a photograph of the defendant signed by Mr. Phillips. Mr. Phillips stated that he had signed the photo at the hospital after being shot, but was under much medication. At that time, he believed the individual in the photo was the person who shot him and he had voiced this to C.I. Strickler. However, at the time of trial, Mr. Phillips no longer believed that the defendant was the one who shot him.

The photograph was admitted as Commonwealth's Exhibit One.

Assistant District Attorney Speece showed a second photograph to Mr. Phillips. Mr. Phillips' signature also appeared on this photograph. Mr. Phillips responded that he had never seen the person in the photo prior to the night he was shot, but that when he signed it, he thought that was the other person involved in the shooting. He adamantly stated that the defendant was not the person who shot him. Mr. Phillips stated that he lied during his testimony at the preliminary hearing. On cross-examination he stated that he heard from other people that the defendant shot him, but he did not really know who it was. The defendant was not licensed to carry a firearm at the time of this incident. A shell casing from a handgun was recovered from the scene of the shooting.

The transcripts of the preliminary hearing and pretrial hearing were read to the jury during trial. The facts gleaned from Mr. Phillips' preliminary hearing testimony are set forth in this paragraph. Mr. Phillips was leaving the Renaissance bar, walking to his car with a friend at about midnight. The friend noticed two men approaching and ran away from the area. Mr. Phillips knew one of the men as Bill and identified this person as the defendant. The other individual he knew as Ant. Ant punched [Mr. Phillips], pushed him into a corner, reached into [Mr. Phillips'] pockets, and removed his cash. Bill had his hands in his pockets the entire time, until Mr. Phillips began to turn to leave. Bill made a comment about Mr. Phillips. At that point, Mr. Phillips saw Bill take his hands out of his jacket pockets. Mr. Phillips heard a gunshot, and felt the bullet enter his side. He did not see

what Bill had in his hand, although he was only about three feet away. Mr. Phillips could see Ant next to him, but did not see a gun in his hands. Ant and Bill entered their vehicle that was a few feet away from them and left the area.

Mr. Phillips had failed to appear at the scheduled preliminary hearing on two occasions; therefore, a bench warrant was issued for his arrest. Upon arrest, controlled substances were found in his possession. He was subsequently sentenced to three to six years incarceration for that possession of a controlled substance.

A portion of the pretrial transcript was read to the jury during trial. That portion included a statement by the defendant's attorney that Mr. Phillips did not wish to testify. When asked if he recalled what happened at the Renaissance, Mr. Phillips stated that he did not remember what happened other than going to the hospital and talking with the Reading Police because he had been shot in his back. Later Mr. Phillips stated that he did remember but did not wish to testify. When shown a photograph of the defendant that Mr. Phillips had previously signed, Mr. Phillips acknowledged that this was a photo of the defendant and that he was familiar with the defendant by sight, but did not personally know him. Mr. Phillips stated that he had testified truthfully at the preliminary hearing, but must have been mistaken. He was on medication at the time of both the preliminary hearing and the pretrial hearing.

Trial Court Opinion (T.C.O.), 7/19/07, at 2–5.

¶ 3 Appellant proceeded to a jury trial on July 6, 2006, following which he was convicted of the above-noted crimes. On January 2, 2007, the trial court imposed the aggregate judgment of sentence of fourteen to thirty years' imprisonment. Appellant filed a timely post-trial motion, which the trial court denied on January 23, 2007. Appellant filed a timely appeal on February 15, 2007, but later, on November 11, 2007, our Court dismissed the appeal for the failure to file a brief. Appellant filed a timely petition for post conviction collateral relief, following which his direct appeal rights were reinstated *nunc pro tunc*. We are now presented with Appellant's timely direct appeal.

¶ 4 Appellant raises the following issues in the "Statement of the Questions Involved" portion of his brief:

A. WAS THE EVIDENCE INSUFFICIENT TO SUSTAIN THE VERDICT BECAUSE THE IDENTIFICATION FROM VICTIM WITNESS (MARTIN PHILLIPS) RECANTED HIS PREVIOUS TESTIMONY [sic] IMPLICATING APPELLANT AND THE VICTIM STATED THAT HIS IDENTIFICATION WAS BASED ON WHAT HE HEARD FROM OTHER PEOPLE?

B. DID THE TRIAL COURT ERR IN DENYING APPELLANT'S PRETRIAL MOTION FOR WRIT OF HABEAS CORPUS BASED ON TESTIMONY AT THE PRELIMINARY HEARING WHERE THE WITNESS RECANTED HIS PRELIMINARY HEARING TESTIMONY AT THE PRETRIAL HEARING, AND THE "LOSS OF MEMORY" STANDARD WAS IMPROPERLY APPLIED BECAUSE DEFENSE COUNSEL DID NOT HAVE DISCOVERY AVAILABLE AT THE TIME OF THE PRELIMINARY HEARING?

C. DID THE TRIAL COURT ERR IN FAILING TO CHARGE THE

JURY THAT WHERE THERE IS A RECANTATION OF PRIOR TESTIMONY AT TRIAL THE LAST STATEMENT OF A WITNESS IS THE ONE THAT CONTROLS AND ALL PREVIOUS STATEMENTS MUST BE DISREGARDED[?]

D. DID THE TRIAL COURT ERR IN ALLOWING THE COMMONWEALTH'S ATTORNEY TO TREAT ITS OWN WITNESS (MARTIN PHILLIPS) AS A HOSTILE WITNESS WITHOUT THE PROPER FOUNDATION HAVING BEEN LAID, WEREBY PREJUDICING APPELLANT?

E. DID THE TRIAL COURT ERR IN ALLOWING THE PROSECUTION TO PRESENT EVIDENCE OF HEARSAY STATEMENTS THROUGH OFFICER REILLY UNDER THE EXCITED UTTERANCE EXCEPTION TO HEARSAY?

F. DID THE TRIAL COURT ERR IN NOT GRANTING APPELLANT'S MOTION FOR A MISTRIAL AFTER THE REMARKS MADE BY THE COMMONWEALTH'S ATTORNEY IN RELATION TO THE SOURCE OF A JNET PHOTOGRAPH OF APPELLANT?

Appellant's brief at 5–6 ("suggested answers" omitted).

¶ 5 In his first issue, Appellant contends that the evidence was insufficient to sustain the verdicts as to all the crimes for which Appellant was convicted.

Our standard of review of sufficiency claims requires that we evaluate the record "in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Com-monwealth v. Widmer*, 560 Pa. 308, 744 A.2d 745, 751 (2000).

"Evidence will be deemed sufficient to support the verdict when it established each element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt." Nevertheless, "the Commonwealth need not establish guilt to a mathematical certainty," and may sustain its burden by means of wholly circumstantial evidence. Significantly, "[we] may not substitute [our] judgment for that of the factfinder; if the record contains support for the convictions they may not be disturbed."

*Commonwealth v. Brewer*, 876 A.2d 1029, 1032 (Pa.Super.2005) (citations omitted). Any doubt about the defendant's guilt is to be resolved by the factfinder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *See Commonwealth v. DiStefano*, 782 A.2d 574, 582 (Pa.Super.2001).

*Commonwealth v. Scott*, 967 A.2d 995, 997 (Pa.Super. 2009).

¶ 6 Specifically, Appellant argues: "Unlike typical challenges to the sufficiency involving the elements of the crimes, Appellant challenges the recanted identification given by the victim. Put simply, Appellant was misidentified as the shooter of the victim, yet the victim's misidentification and numerous statements were used to convict him." Appellant's brief at 16. Appellant further argues that "the trial court correctly stated that Appellant's insufficient evidence claim does not challenge any element of the crimes, but rather disputes the identification." *Id.* at 17. Appellant contends that *Commonwealth v. Bennett*, 224 Pa.Super. 238, 303 A.2d 220 (1973) *(en banc)* is analogous to the instant

case and requires that his judgment of sentence be reversed.

¶ 7 The defendant in *Bennett* was found guilty of receiving stolen property, an automobile, and she argued that the trial court erred by refusing to enter a directed verdict in her favor because the testimony presented against her by the Commonwealth's witness was "so inconsistent and contradictory as to be insufficient to support a finding of guilt." *Bennett*, 303 A.2d at 220. Our Court agreed. Specifically, the defendant had been a passenger in the automobile while it was being driven by Harry Jones. *Id.* Later, the defendant had been found driving the vehicle with Jones as a passenger. *Id.* Jones eventually confessed to the theft of the automobile and the Commonwealth relied on his testimony to prosecute the defendant. *Id.* Jones gave

> several wholly different, conflicting and inconsistent versions of when and how he had told [the defendant] that the car had been in fact stolen by him. On a previous occasion Jones had denied he had ever conveyed to defendant knowledge of the car's theft. With each new version Jones would recant the previous one and protest that the newest version was in fact the true one.

*Id.* In reversing the defendant's conviction, our Court concluded:

> This situation presented the jury not with a mere conflict or contradiction in testimony which was reasonably reconcilable by them, but a situation falling with the rule: ". . . a case should not go to the jury where the party having the burden offers testimony of a witness, or of various witnesses, which is so contradictory on the essential issues that any finding by the jury would be a mere guess . . . when the testimony is so contradictory on the basic issues as to make any verdict based thereon pure conjec-

ture the jury should not be permitted to consider it": *Com. v. Bartell,* 184 Pa.Super. 528, 537, 538, 136 A.2d 166, 172 (1957). (emphasis added)[.]

*Id.* at 221. One of the major deficiencies of the *Bennett* decision is that it fails to identify under where or under what circumstances Jones gave his various versions. As discussed further below, since the *Bennett* decision, our courts have refined and developed when prior inconsistent statements of witnesses are properly admitted as substantive evidence and, again as explained infra, in the instant case, since the prior inconsistent statement of Mr. Phillips which implicated Appellant was given under reliable circumstances, i.e., in court under oath with the full opportunity for cross examination, those statements were properly admitted.

¶ 8 Moreover, Mr. Phillips' versions of the shooting were consistent insofar as he implicated Appellant in an excited utterance as he lay bleeding on the sidewalk from a gunshot wound to the back, two days later in the hospital, and again at the preliminary hearing. It was only later that Mr. Phillips either could not recall who shot him or indicated that it was not Appellant, as elucidated *infra.* Accordingly, Mr. Phillips' "versions" of the events in the instant case may not have been as inconsistent as those of the witness in *Bennett,* who gave several versions of the events underlying that case, each time recanting the previous version.

¶ 9 Appellant also relies on *Commonwealth v. Farquharson,* 467 Pa. 50, 354 A.2d 545, 550 (1976), which cited *Bennett* for the proposition that "where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." However, our Supreme Court refused to apply the so-called *Bennett*

principle in *Farquharson,* under circumstances where a former lover of the defendant shot the victim and then testified against the defendant, who was also charged with murder and conspiracy. The former lover implicated the defendant in the shooting, whereas the defendant claimed she was uninvolved. The Court noted: "Traditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution." *Farquharson,* 354 A.2d at 550. However, the Court recognized that the issue of credibility goes to the weight of the evidence, which is a concept that "must be distinguished from an equally fundamental principle that a verdict of guilt may not be based upon surmise or conjecture." *Id.* The Court concluded that "there are many factors that would cause one to look upon the testimony of [the defendant's former lover] with a jaundiced eye" particularly because the lover was the actual shooter in the crime. "Where parties in crime testify against each other, their testimony must be recognized as coming from a corrupt source and therefore must be subject to the closest scrutiny." *Id.* at 550–51. Moreover, the Court also recognized that the former lover may have been biased because of the deal she struck with the prosecution to testify against the defendant. *Id.* at 551. The Court concluded that such factors, *"standing alone* might not provide the degree of certainty which must necessarily support a finding of guilt in a criminal case" but, since the defendant herself provided some inculpatory statements that corroborated her former lover's testimony, there was "an indicium of trustworthiness to the testimony of [her former lover] on the critical issue sufficient to permit the question to be properly left to the trier of fact." *Id.*

¶ 10 The *Farquharson* case is not very helpful herein because we are not presented with a co-conspirator testifying against a defendant and the attendant unreliable nature of such testimony. Rather, in the instant case, we are presented with a shooting victim who, at trial, interchangeably indicated that he either did not remember who shot him or declared that it was not Appellant who shot him, which was inconsistent with his prior statements and testimony under oath wherein he did identify Appellant as the shooter. However, like *Farquharson,* we conclude that the prior inconsistent statements of Mr. Phillips in the instant case carried an indicia of reliability such that it was proper to have these statements admitted as substantive evidence.

¶ 11 In this regard, we now examine case law that has developed since the time of *Bennett* and *Farquharson,* which deals with the issue of when a witness's prior inconsistent statements may be admitted as substantive evidence (as opposed to being used only for impeachment purposes).

> [O]nly those prior inconsistent statements "that are demonstrably reliable and trustworthy" may be admitted as substantive evidence. *Commonwealth v. Lively,* 530 Pa. 464, 469–71, 610 A.2d 7, 10 (1992). To this end, the *Lively* Court required as a requisite to admissibility, that the prior statement be:
>
> > (1) given under oath at a formal legal hearing;
> >
> > (2) reduced to a writing which was signed or adopted by the witness; or
> >
> > (3) a contemporaneous verbatim recording of the witness's statements.
>
> *Id.; see also Commonwealth v. Johnson,* 536 Pa. 153, 638 A.2d 940 (1994) (holding that, to be admissible, a prior inconsistent statement must have been uttered under highly reliable circumstances which would render inferences to be drawn from it more probable than not).

*Commonwealth v. Grimes,* 436 Pa.Super. 535, 648 A.2d 538, 544 (1994).

¶ 12 Four years after *Grimes,* our Supreme Court clarified that the use of prior inconsistent statements as substantive evidence is permitted when the prior inconsistent statement is a contemporaneous, verbatim recording of a witness's statement, and that recording is either electronic, audiotaped or videotaped, or where the statement was given under oath at a formal legal proceeding, or where the statement is reduced to a writing signed and adopted by the declarant. *Commonwealth v. Wilson,* 550 Pa. 518, 707 A.2d 1114, 1118 (1998). In *Wilson,* our Supreme Court concluded that the trial court erred by admitting at trial as substantive evidence the prior inconsistent statements of two minor victims whose mother, the defendant, was accused of physical abuse. At trial, the children denied that their mother had beaten them and denied implicating their mother to others. *Id.* at 1115. Thus, the trial court allowed the Commonwealth to read into the record a police officer's written notes, in a "question and answer" format, from an interview with the children wherein they had implicated their mother in the abuse. *Id.* The defendant mother argued that the trial court erred in admitting the prior inconsistent statements from these notes as substantive evidence. *Id.* The Court concluded, "Since the questions and answers contained in the police report introduced into evidence in this case were not recorded on audiotape or videotape, the evidence was improperly admitted." *Id.* at 1118.

¶ 13 In another case, *Commonwealth v. Sherman,* 339 Pa.Super. 138, 488 A.2d 348 (1985), which is similar factually to the instant case, the shooting victim of an unprovoked attack first identified the defendant, a man from the same neighborhood as the victim, as his shooter after he was taken to the hospital in critical condition. *Sherman,* 488 A.2d at 349. Next, the victim identified the defendant as the shooter under oath at the preliminary hearing. *Id.* However, due to threats on his life, the victim "declined to positively identify [the defendant] at trial" and stated that he did not remember who shot him, although he did testify to many of the other same facts that he had testified to at the preliminary hearing (such as the date and place of the shooting and seeing the defendant standing two feet away from him just before the shooting). *Id.* Accordingly, the Commonwealth introduced the victim's preliminary hearing testimony and the statements he made in the hospital identifying the defendant as substantive evidence. *Id.* The defendant contested the admission of these statements on appeal. After examining the victim's trial testimony, we concluded that he was repeatedly asserting that he could not remember who shot him. *Id.* at 350. We noted that where a witness suffers either a total or a partial loss of memory, that witness may be deemed unavailable and, therefore, that witness's prior testimony could be introduced as substantive evidence. *Id.*

¶ 14 We now conduct a detailed review of the trial record in this case, beginning with an in-depth examination of Mr. Phillips' testimony, to determine whether the evidence of the identification of Appellant as the perpetrator in this case was sufficient. Initially, on direct examination by the Commonwealth, Mr. Phillips stated that he did not see the person who shot him in the courtroom. N.T. Trial, 7/12/06, at 37. Although he indicated that Appellant was with him in the parking lot at the time of the shooting, he maintained that Appellant was "nowhere near [him] when the incident happened" and he declared that Appellant was not the person who shot him. *Id.* at 38, 48. When presented with the picture of Appellant that he

signed when in the hospital two days following the incident, Mr. Phillips explained that he was heavily medicated and in pain at the time he identified Appellant's picture, and he reiterated that there were "quite a few people in the parking lot that night" and that he "thought it was" Appellant who shot him "but it wasn't." *Id.* at 41. Mr. Phillips again declared that Appellant was not the person who shot him, but he also declared several times that he did not know who shot him. *Id.* at 41–42, 59, 61.

¶ 15 Further, with regard to his memory, Mr. Phillips could not recall the time he was shot, what happened after he was shot, or why he was shot (although he indicated the matter was "petty"). *Id.* at 38, 47–48. Additionally, during direct examination, Mr. Phillips was uncooperative, stating for example that the Commonwealth was asking him "trick questions" and was "trying to trick" him. *Id.* at 48. He threatened to leave the stand, stating again that Appellant was not the person who shot him. *Id.*

¶ 16 The Commonwealth presented Mr. Phillips with the testimony he gave at the preliminary hearing in this case on February 17, 2006. *Id.* at 49. Immediately, right after he was told to look at the transcript of that proceeding, Mr. Phillips asserted that he had "lied" at that proceeding. *Id.* Mr. Phillips vacillated between confirming his prior testimony, recanting his prior testimony, and stating that he did not remember. For example, when asked whether it was Ant who punched him and went through his pockets during the incident (as he had testified during the preliminary hearing), Mr. Phillips stated, "I think so. It wasn't him, though. I don't remember. I said I lied." *Id.* at 51.

¶ 17 Direct examination of Mr. Phillips by the Commonwealth continued with Mr. Phillips asserting that he did not remember speaking to the officer who arrived on the scene of the incident or telling that officer that it was Appellant and Ant who attacked and robbed him. *Id.* at 53–54. With regard to the visit from investigators to his hospital room two days after the shooting, Mr. Phillips claimed that he did not remember implicating Appellant and Ant. *Id.* at 54–55. He stated he did not remember how long he was in the hospital, how long he was on pain medication following his release from the hospital, and, when asked to identify his injuries, Mr. Phillips proclaimed: "There's nothing to talk about. I don't want to talk about my injuries. I'm tired of talking, man. I want to go back. The man here is not the man that shot me, simple as that." *Id.* at 55, 57. When directed to answer the question by the court, Mr. Phillips stated "You can't make me answer anything." *Id.* at 57. He claimed that if he had to answer all the questions, they would be in court "all fucking night[.]" *Id.* at 58. He again asserted, "That's not the man that shot me." *Id.* Finally, when asked again to identify his injuries, Mr. Phillips told the Commonwealth, "I don't know. Get the medical records." *Id.* However, soon thereafter, he admitted that he had injuries to his bowels and difficulty walking. *Id.* at 60.

¶ 18 On cross examination by defense counsel, Mr. Phillips indicated that he told police that the perpetrators were Appellant and Ant because he "had heard that on the streets[.]" *Id.* at 61. But he again claimed that he did not know who shot him. *Id.* Rather, he told police what he thought he had heard, through word of mouth, regarding who shot him. *Id.* at 61–62.

¶ 19 On redirect examination by the Commonwealth, Mr. Phillips became increasingly belligerent, indicating that he did not remember his testimony from the

preliminary hearing and that he was "done talking." *Id.* at 62. He again asserted that he did not know who shot him and that he "ain't going to see no innocent person go down for nothing." *Id.* He stated again, in the same reply, both that he did not remember who shot him and that he did not know who shot him. *Id.* (*i.e.*, "I don't remember. I don't know who shot me. I don't know who shot me. I'm done talking."). Mr. Phillips concluded, "Well, I'm done talking, man, I'm out of here" and got up to leave the witness stand. *Id.* at 63. He told the sheriff deputies in the courtroom, "Don't be pushing me. What are you pushing me for? Why you put your hands on me?" *Id.* He again stated that Appellant did not shoot him and for the deputies to "Don't put your fucking hands on me no more." *Id.* at 64.

¶ 20 At that point, the court stated, "All right. What we're going to do is finish with this witness. This Court—I mean, obviously his position is he doesn't remember. He doesn't know. He said it many times. He said other things. And at this time you may step down." *Id.* After that, Mr. Phillips had the opportunity to state finally: "You better talk to your fucking man here. Put your fucking hands on me, man. Chump, you heard what the fuck I said. Take these handcuffs off me." *Id.* at 65. The court stated "we won't deal with this witness anymore," allowed Mr. Phillips to leave the stand, and then permitted, over Appellant's objection, the reading of redacted portions of Mr. Phillips' preliminary hearing testimony to the jury. *Id.*

¶ 21 Appellant objected to the reading of the transcript on the basis that Mr. Phillips was not "suffering from a lack of memory" but that "he didn't tell the truth" at the preliminary hearing and had merely mimicked what he had heard others say about who shot him. *Id.* In response to Appellant's objection, the trial court acknowledged that, throughout his testimony, Mr. Phillips stated many times that Appellant was not the person who shot him. *Id.* However, the court also noted that Mr. Phillips likewise stated many times that he did not remember and, therefore, the court indicated that it was "declaring [Mr. Phillips] an unavailable witness for those reasons. He doesn't remember. There's case law that establishes if somebody doesn't remember partially, that's enough for the transcript to be used. And that's what we're going to do. We're not going to try to hear anything further from this witness." *Id.* at 66. Thus, the trial court permitted the reading of redacted portions of Mr. Phillips' preliminary hearing testimony.

¶ 22 Of course, as indicated above, Mr. Phillips implicated Appellant in the robbery and shooting at the preliminary hearing, which testimony we now summarize. *Id.* at 71–72. Mr. Phillips testified, at that time, that Appellant and Ant approached him, Ant punched him, Ant took money from Mr. Phillips, he did not see a gun in Ant's hands, but Appellant had his hands in his own pockets and, after Appellant made a derogatory remark to Mr. Phillips, Mr. Phillips began to walk away when he saw Appellant take his right hand out of his pocket and heard a gunshot. *Id.* at 73–75, 85, 88. Mr. Phillips stated that Appellant had shot him in his back as he was trying to walk away, from a distance of two to three feet. *Id.* at 78, 88. He claimed: "Ant didn't shoot me. [Appellant] shot me." *Id.* at 90. He stated that Appellant and Ant walked away from the scene, got into an SUV, and drove away. *Id.* at 76. He admitted that he "knew" Appellant and Ant from "see[ing] them around and that." *Id.* at 82.

¶ 23 Redacted portions of the pretrial transcript, dated April 20, 2006, were then read to the jury, which we now summarize. Specifically, at that time, Mr. Phillips told the court that he did not want to testify and that he did not remember "certain stuff" including who shot him. *Id.* at 100, 103. When presented with the photograph of Appellant that he signed while in the hospital, in which he identified Appellant as the shooter, he stated he remembered signing it but that he was "mistaken" and that, at the time, he thought Appellant was the person who shot him. *Id.* at 107–108. However, curiously, he also testified, at the pretrial hearing, that he had testified truthfully at the preliminary hearing, even though the version of events he gave at that time implicated Appellant as the shooter. *Id.* at 108.

¶ 24 The Commonwealth's next trial witness was Officer Paul Reilly, the first officer to respond to the scene of the shooting in the case, and he arrived within two to three minutes of receiving the dispatch call. *Id.* at 116–117. Emergency medical personnel arrived on the scene at the same time as Officer Reilly, who observed Mr. Phillips seated on the sidewalk, bleeding from his back. *Id.* at 116–117, 123. Officer Reilly asked Mr. Phillips who shot him. *Id.* at 124. Mr. Phillips immediately replied, that a light-skinned black "guy he knows as Bill shot him." *Id.* at 129. (This statement was admitted by the trial court, over defense counsel's objection, as an excited utterance, as further discussed below). Officer Reilly followed Mr. Phillips to the hospital that night, where he claimed that Mr. Phillips appeared to be upset, crying, and in pain. *Id.* at 117.

¶ 25 On the second day of trial, the Commonwealth called its last witness, William Strickler, the lead criminal investigator in this case. *Id.* at 139. He was the investigator who visited Mr. Phillips in the hospital two days after the shooting. *Id.* At that time, he showed Mr. Phillips a photograph of Appellant, upon which Mr. Phillips responded, "Yeah, that's the mother fucker that shot me. That's Bill." *Id.* at 161. Mr. Phillips also identified Ant as the person who robbed him. *Id.* Mr. Phillips signed both pictures identifying Appellant and Ant, and gave an oral statement to Investigator Strickler implicating Appellant. *Id.* at 162, 167–68. Although Mr. Phillips was in the intensive care unit at the time he spoke to Investigator Strickler, Investigator Strickler testified that when Mr. Phillips was making his statement, he was "[v]ery sure of himself" despite being in a lot of pain and did not appear sedated. Finally, there was evidence that Mr. Phillips' story changed at the point where he himself was arrested on a drug charge and, because the police were not "helping him out with his case", he became an uncooperative witness in the instant case. *Id.* at 189.

¶ 26 Based on the above summary of the trial record, we conclude that the evidence was sufficient to identify Appellant as the perpetrator in the instant case. First, the preliminary hearing testimony, in which Mr. Phillips implicated Appellant, was properly admitted as substantive evidence as it was given under oath and defense counsel, at that time, had the opportunity to fully cross examine Mr. Phillips. *Grimes,* 648 A.2d at 544. Second, the trial court did not err by determining, contrary to Appellant's characterization of the record, that Mr. Phillips had a partial loss of memory with regard to the events in the instant case. Thus, the trial court did not err by deeming Mr. Phillips unavailable and admitting his prior testimony given under oath at the preliminary hearing (in which he positively identified Appellant) as substantive evidence. *Sherman,* 488 A.2d at 349. Indeed, the facts of

the instant case are most akin to those in *Sherman,* where we concluded that a witness's prior inconsistent statements were properly admitted where the witness had previously implicated the defendant, but suddenly could not remember who shot him after threats were made on his life prior to trial.[2]

¶ 27 We must view the record in the light most favorable to the prevailing party when assessing the sufficiency of the evidence. Accordingly, as Mr. Phillips' testimony from the preliminary hearing implicating Appellant was properly admitted under both *Grimes* and *Sherman,* we conclude that the evidence at trial was sufficient to identify Appellant as the perpetrator. Identification of Appellant as the perpetrator was further supported by admission of Mr. Phillips' excited utterance to Officer Reilly at the scene implicating a light-skinned black male named Bill, and Investigator Strickler's testimony regarding Mr. Phillips' identification of Appellant's photo in the hospital.[3]

■ ¶ 28 In his second issue, Appellant argues that the trial court erred by denying his pretrial motion for writ of *habeas corpus.* However, "[a]n order denying pre-trial *habeas corpus* relief is not a final order but, rather, is an interlocutory order and, thus, is not immediately appealable by right." *Commonwealth v. Yingling,* 911 A.2d 572, 574 (Pa.Super.2006). In order to have properly contested the denial of his request for *habeas corpus* relief, Appellant should have sought to take an immediate appeal by permission pursuant to 42 Pa. C.S. § 702(b). *Id.* Appellant did not do so.

¶ 29 In any event, Appellant's argument in support of this second issue is essentially a reiteration of his argument in support of his first issue challenging the sufficiency of the evidence. In fact, in support of this second issue, Appellant relies exclusively on Mr. Phillips' pretrial testimony exculpating Appellant. However, as fully explained above, Mr. Phillips' excited utterance at the scene of the shooting, his identification of Appellant in the hospital two days later, and his implication of Appellant as the shooter while testifying under oath and subject to cross examination at the preliminary hearing, was sufficient to allow the case to proceed to trial. Accordingly, we are not persuaded that Appellant's second issue has merit.

■ ¶ 30 In his third issue, Appellant argues that the trial court erred by failing to instruct the jury "that where there is a

---

**2.** Like the witness in *Sherman,* Mr. Phillips' testimony appeared to change after he was denied assistance from police authorities in his own drug case, which is akin to the situation in *Sherman* where the witness's story changed before trial due to threats on his life. In other words, there appears to be an underlying reason for Mr. Phillips' change of heart. Indeed, the circumstances of the instant case are almost exactly the same as those in the *Sherman* case, which, surprisingly, was not cited by either party or the trial court herein.

**3.** Our analysis and conclusions are tailored to the issues and arguments raised by Appellant in his brief. In this regard, we note that Appellant does not raise or argue a weight of the evidence claim nor does he contest the admission, through Investigator Strickler's testimony, of the identification of Appellant by Mr. Phillips in the hospital on the basis of the reasoning in *Wilson, supra (i.e.,* he does not challenge the admission of a prior inconsistent, unrecorded, oral statement of Mr. Phillips, which implicated Appellant). Indeed, as in *Wilson,* Mr. Phillips' oral statement was summarized in written notes taken by Investigator Strickler, *see* N.T. at 183–85, and there is no evidence that Mr. Phillips signed this statement, only that he signed the backs of the photos. Nevertheless, we cannot act as one party's advocate, nor can we address issues or arguments that have not been raised and developed. In sum, Appellant has not presented argument to persuade this Court that the evidence was insufficient to sustain the verdicts.

recantation of prior testimony at trial the last statement of a witness is the one what controls and all previous statements must be disregarded." Appellant's brief at 29. This argument fails because, as described above, Mr. Phillips did not merely recant, he also suffered from a partial loss of memory. Thus, the premise underlying Appellant's argument is flawed. Moreover, we find unavailing Appellant's reliance on *Commonwealth v. Kibler*, 215 Pa.Super. 367, 258 A.2d 681, 682 (1969), for the proposition that "the final statement of a witness is the one which controls" and that "where a witness who has testified subsequently recants his testimony on the witness stand, the trial judge must instruct the jury to disregard the previous testimony[,]" which rule "is more applicable where the witness positively repudiates his earlier testimony." First, *Kibler* is distinguishable insofar as the witness who testified against the defendant at trial in that case was the defendant's co-conspirator, and the witness's recantation occurred during the course of trial, on cross-examination, after he had implicated the defendant on direct examination. Second, subsequent Supreme Court cases such as *Wilson*, discussed *supra*, make it clear that prior inconsistent statements may be considered by the jury when properly admitted. Accordingly, we conclude that Appellant's third issue lacks merit.

¶ 31 In his fourth issue, Appellant argues that the "trial court abused its discretion in declaring [Mr.] Phillips a hostile witness merely because he refused to testify to the Commonwealth's liking."

> Leading questions should not be used on the direct or redirect examination of a witness except as may be necessary to develop the witness' testimony. . . . . When a party calls a hostile witness, . . . interrogation may be by leading questions. . . .

Pa.R.E. 611(c). As discussed in *Commonwealth v. Lambert*, 765 A.2d 306, 360 (Pa.Super.2000), the "trial judge has wide discretion in controlling the use of leading questions." "The court's tolerance or intolerance for leading questions will not be reversed on appeal absent an abuse of discretion." *Lambert*, 765 A.2d at 360. A witness may be treated as hostile by the party calling him where the testimony of the witness is unexpected, contradictory to earlier statements, and harmful to the party calling the witness, and where an injustice would result if the request to treat the witness as hostile is denied. *Id.* at 357–59. In *Lambert*, we agreed with the trial court who refused to treat certain witnesses as hostile because those witnesses were cooperative and responsive. *Id.* at 360. They appeared at trial willingly, their attendance at trial did not need to be coerced, each of them were willing to answer questions, and none of them appeared to be evasive. *Id.* The same cannot be said for Mr. Phillips, as evidenced by his overt unwillingness to testify and his belligerence on the stand. The trial court did not abuse its discretion in permitting the Commonwealth to treat Mr. Phillips as a hostile witness.

¶ 32 In his fifth issue, Appellant argues that the trial court abused his discretion by allowing Officer Reilly to testify that Mr. Phillips told him, at the scene of the shooting, that a light-skinned black male named "Bill" shot him, which statement was admitted under the excited utterance exception to the rule against hearsay.

> [An excited utterance is a] spontaneous declaration by a person whose mind has been suddenly made subject to an overpowering emotion caused by some unexpected and shocking occurrence, which that person had just participated in or closely witnessed, and

made in reference to some phase of that occurrence which he perceived, and this declaration must be made so near the occurrence both in time and place as to exclude the likelihood of its being emanated in whole or in part from his reflective faculties.

*Commonwealth v. Upshur,* 764 A.2d 69, 75 (Pa.Super.2000) (citations omitted).

In assessing a statement offered as an excited utterance, the court must consider, among other things, whether the statement was in narrative form, the elapsed time between the startling event and the declaration, whether the declarant had an opportunity to speak with others and whether, in fact, she did so. *Commonwealth v. Sanford,* 397 Pa.Super. 581, 580 A.2d 784, 788 (1990), *appeal denied,* 527 Pa. 586, 588 A.2d 508 (1991).[T]here is no bright line rule regarding the amount of time that may elapse between the declarant's experience and her statement. "[T]he crucial question, regardless of the time lapse, is whether, at the time the statement is made, the nervous excitement continues to dominate while the reflective processes remain in abeyance." *Commonwealth v. Gore,* 262 Pa.Super. 540, 396 A.2d 1302, 1305 (1978). It is "the spontaneity of . . . an excited utterance [that] is the source of reliability and the touchstone of admissibility." *Commonwealth v. Chamberlain,* 557 Pa. 34, 40, 731 A.2d 593, 596 (1999) (citations omitted).

*Commonwealth v. Carmody,* 799 A.2d 143, 147 (Pa.Super.2002).

¶ 33 Although at the time he was shot and Officer Reilly arrived on the scene there were people around the victim, there is no evidence that those persons were speaking to the victim or telling him that he was shot by "Bill." Moreover, the trial court considered thoroughly the circumstances surrounding the statement made by Mr. Phillips to Officer Reilly. Although Officer Reilly responded to the scene within a couple of minutes of receiving the dispatch call, the exact time of the shooting was not established. Nevertheless, when Officer Reilly arrived on the scene, the victim was sitting on the sidewalk, bleeding, and appeared to have suffered a gunshot. Given the level of trauma and the apparent swiftness with which Officer Reilly appeared on the scene, the trial court did not abuse its discretion by concluding that the nervous excitement of the situation had not abated and that Mr. Phillips' answer to the one simple question of Officer Reilly, *i.e.,* regarding who shot him, was an excited utterance implicating Appellant.

¶ 34 In his final issue, Appellant argues that the trial court erred in failing to grant Appellant's motion for a mistrial on the basis of the following remarks made in the Commonwealth's closing argument: "Then he's in the intensive care unit at the hospital. He's interviewed by Investigator Strickler about this, and he is shown the photograph of suspects. Through good investigation, Investigator Strickler had pulled—for reason that we can't go into—and he shows him those two photographs." N.T. Trial at 230. The trial court denied Appellant's motion for a mistrial on the basis of this comment; however, defense counsel agreed to the following curative instruction given to the jury:

Members of the jury, there had been reference made to the photographs [of Appellant and Ant] . . . and we want to make sure that there's not any emphasis by you as to where they came from and what that might mean, how they were obtained by the police. And so to take away any issue of where they came from and any speculation that there might be as to where they came from, especially since they are black and white photos;

and I guess like drivers' licenses, they don't necessarily look real good, I have to tell you that this system that generates this can generate photos of everyone in here, all of us. So I just want you to know that with regard to the photos.

*Id.* at 244–45. This instruction cured any possibility that a juror may have insinuated the existence of a criminal record given the remarks during the Commonwealth's closing. Additionally, as the trial court observed:

[t]he phrase regarding good investigation may be taken as describing the investigation done to locate a photograph of the light skinned black male named Bill who was in the area of the Renaissance the night of the shooting. This does not seem to over emphasize the source of the photo, as the defendant argues. The words "for reasons we can't go into" are more troubling; however, these 'reasons' could be any reason such as an undocumented source of information. In view of the curative instruction that the photograph was taken from a neutral source, there was little or no prejudice to the defendant from this comment. Therefore, the error was harmless.

T.C.O. at 16. We conclude that the trial court did not err or abuse its discretion.

¶ 35 Judgment of sentence affirmed.