J-A10040-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TYRELL M. GOODING | |
| Appellant | No. 560 MDA 2014 |

Appeal from the Judgment of Sentence January 25, 2013
in the Court of Common Pleas of Dauphin County
Criminal Division at No(s): CP-22-CR-0003513-2011

BEFORE:  GANTMAN, P.J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.:                        **FILED MAY 14, 2015**

Tyrell M. Gooding ("Appellant") appeals from the judgment of sentence entered following his jury trial conviction for two counts of robbery (inflict serious bodily injury),[1] and one count each of aggravated assault,[2] persons not to possess firearms,[3] and firearms not to be carried without a license.[4] We affirm.

On July 8, 2010, police arrested Appellant.  Following a jury trial conducted on December 3-5, 2012, a jury convicted Appellant as stated

_____

[1] 18 Pa.C.S. § 3701(a)(1)(i).

[2] 18 Pa.C.S. § 2702(a)(1).

[3] 18 Pa.C.S. § 6105(a)(1).

[4] 18 Pa.C.S. § 6106(a)(1).

*supra*. On January 25, 2013, the trial court sentenced Appellant to 84 to 168 months' incarceration on the first robbery conviction, 84 to 168 months' incarceration on the second robbery conviction to be served consecutively to the first, 84 to 168 months' incarceration on the aggravated assault conviction to be served concurrently with the second robbery sentence, 48 to 96 months' incarceration on the persons not to possess firearms conviction to run concurrently with the second robbery sentence and the aggravated assault sentence, and 36 to 72 months' incarceration on the firearms not to be carried without a license to run consecutive to the second robbery conviction.

On February 22, 2013, Appellant filed a timely notice of appeal. This Court dismissed that appeal on May 2, 2013, for failure to file a docketing statement in compliance with Pa.R.A.P. 3517. **See Commonwealth v. Gooding**, 436 MDA 2013 (May 2, 2013, *per curiam*). Appellant thereafter filed a petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-9546, seeking reinstatement of his direct appeal rights based on counsel's failure to file the docketing statement with this Court as ordered. The PCRA court granted Appellant's petition on March 3, 2014. Appellant then filed a timely notice of appeal on March 28, 2014, and filed a Pa.R.A.P. 1925(b) statement of errors complained of on appeal on June 10, 2014. The trial court issued its Pa.R.A.P. 1925(a) opinion on July 18, 2014.

Appellant raises the following issue for review:

A. Did the trial court commit an error of law in sentencing the appellant because [the] evidence adduced at trial and all reasonable inferences therefrom were insufficient as a matter of law to support any finding of guilt?

Appellant's Brief, p. 5 (all capitals removed). Specifically, Appellant asserts that, because the Commonwealth's witnesses (1) testified they were under the influence of narcotics at the time of the incident, and (2) recanted their prior identifications of Appellant at trial, the Commonwealth put forth insufficient evidence to convict Appellant.[5] *See* Appellant's Brief, pp. 13-14. This claim challenges the sufficiency of the evidence.[6]

When examining a challenge to the sufficiency of evidence, our standard of review is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the

_____

[5] The only legal authority Appellant cites is the law pertaining to the standard of review for sufficiency of the evidence claims. *See* Appellant's Brief, pp. 12-14. Additionally, Appellant includes no citations to the record to support his argument. *Id.* Ordinarily, such citation deficiencies may form grounds for waiver of claims. *See* Pa.R.A.P. 2119. However, because Appellant's claim is basic and readily ascertainable, we will examine the claim on its merits.

[6] Although, as the Commonwealth argues, this claim appears to challenge the weight of the evidence, not the sufficiency of the evidence, this Court has determined where witnesses recant their testimony, such a claim goes to the sufficiency of the evidence. *See Commonwealth v. Bibbs*, 970 A.2d 440 (Pa.Super.2009); *Commonwealth v. Sherman*, 488 A.2d 348, 349 (Pa.Super.1985).

crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super.2011), *appeal denied*, 32 A.3d 1275 (Pa.2011).

Witness recantation occurs not infrequently in the prosecution of criminal matters. "It is well settled that it is within the trial court's discretion to permit a party to impeach its own witness with prior inconsistent statements." *Commonwealth v. Grimes*, 648 A.2d 538, 543 (Pa.Super.1994). To properly invoke such discretion, the trial court must consider the following factors:

(1) whether the testimony was unexpected;

(2) whether the testimony was contradictory;

(3) whether the testimony was harmful to the party calling the witness and beneficial to the opposing side; and

(4) whether the scope of cross-examination was excessive.

*Grimes*, 648 A.2d at 543-44 (citing *Commonwealth v. Waller*, 444 A.2d 653, 656 (Pa.1982)). Further, when faced with a witness who recants, our Supreme Court has ruled that the Commonwealth may introduce as substantive evidence, "only those prior inconsistent statements [of the witness] 'that are demonstrably reliable and trustworthy[.]'" *Id.* at 544. Permitted "reliable and trustworthy" prior inconsistent statements include: (1) contemporaneous, verbatim, electronic, audiotaped or videotaped recordings of a witness's statements, (2) statements given under oath at a formal legal proceeding, or (3) statements reduced to a writing signed and adopted by the declarant. *Bibbs*, 970 A.2d at 448 (citing *Commonwealth v. Wilson*, 707 A.2d 1114, 1118 (Pa.1998)).

The trial court summarized the evidence introduced at the trial of this matter as follows:

> At 5:30 a.m., on July 8, 2010, Officer Nathan Ishman ("Officer Ishman") of the Harrisburg Bureau of Police ("HBP") was dispatched to respond to a shots fired call at 18th and Regina Streets in the Allison Hill section of Harrisburg City. The dispatch also reported that a victim was in a residence at 40 North 17th Street, one block west of the reported shooting location. Officer Ishman arrived at the 17th Street residence along with Officer Rudy of the HBP where they observed a chaotic scene through the open door with the victim seated on a chair and bleeding from the chest. In an attempt to stop the bleeding, one of the people present was putting pressure on the gunshot wound which was located at right chest above the breast. Officer Ishman was able to obtain the victim's name, Deangelo Letterlough ("Letterlough"), date of birth and a few facts about the shooting incident. The information provided by Letterlough included a description of the individuals involved in the shooting. Letterlough was transported by ambulance to the hospital.

Officers Ishman and Rudy proceeded to 18th and Regina Streets on foot to investigate. At the crime scene, by a house on the northwest corner, the officers found a cellphone charger, black bandana and sunglasses. They also observed droplets of blood on the sidewalk alongside a small local store at 17th and Regina Streets across from the residence where Letterlough was found. After the crimes scene was secured, forensic investigator, Officer Christopher Silvio ("Officer Silvio") gathered and processed the evidence police had recovered. In addition to gathering the items found by the responding officers, he found a white washcloth and took a blood sample from the droplets observed on the sidewalk. Officer Silvio later went to the medical center where Mr. Letterlough had been transported for the purpose of photographing his injuries and collecting his clothes as evidence. While at the hospital, he observed and photographed the gunshot wound to Letterlough's right chest.

The washcloth and bandana were later tested for DNA evidence by Alex Glessner of the Pennsylvania State Police forensics lab. A DNA sample was collected from Appellant for comparison of the evidence tested. No interpretable results were obtained from the washcloth. However, testing of the bandana resulted in the identification of at least three DNA contributors from which Appellant could not be excluded. As Appellant's profile matched some of the recovered DNA, Mr. Glessner concluded that he was a contributor; however, there was not a single majority contributor identified.

At trial, Mr. Letterlough testified to his version of the events that took place in the early morning of July 8, 2010. During the evening, Letterlough had run into Courtney Slade and the two were smoking PCP. The pair was walking around the Allison Hill area of Harrisburg with no particular destination. Letterlough testified that, as they approached the intersection of 18th and Regina Streets, three men confronted them. He had recognized one of the men from a previous altercation over a woman. He said that they began arguing and he was ready to fight. While this exchange was taking place, Slade was attempting to diffuse the confrontation. The man with whom Letterlough was arguing made a cellphone call when suddenly, a second individual came running from behind Letterlough, who then put his hands up to fight. The second man said something similar to "this ain't that type of party," pulled a gun and demanded that Letterlough "give it up," a term he recognized from his experience as street terminology meaning he was being

robbed. Letterlough testified that the second man had pulled a revolver from the pocket of his basketball shorts but he "wasn't giving him shit." The second man shot at Letterlough as he was trying to walk away and, as Letterlough turned, he shot a second time hitting him in the chest. The gunshot wound entered through his right upper chest and exited his side. Letterlough continued running until he reached the residence on 17th Street where friends lived. The residents of the house assisted him and called an ambulance.

On December 17, 2010, Letterlough identified Appellant as the shooter when presented with his picture in a photo array. Although reluctant to cooperate with police, he eventually named him as "T" then Tyrell. In a statement provided in an interview with Harrisburg Detective Christopher Krokos ("Detective Krokos"), on March 11, 2011, he repeated that he was sure [Appellant] was the shooter. Despite his identification of Appellant as the shooter during two encounters with police, at trial, Letterlough stated that he was not sure that Letterlough was the shooter. He explained his inconsistency by saying that he had heard that [Appellant] was the shooter and recognized his face from Facebook. However, Letterlough said that when he saw Appellant in person while in jail, he realized that the shooter was a different height. Letterlough also changed his story in that he denied being pressured not to testify despite telling the police that he had been. Also, he said that the shooter was wearing a black T-shirt, rather than a white T-shirt, which he had reported to police.

Lead Detective, Christopher Krokos[,] testified to the identification information Letterlough gave regarding the shooting incident. Detective Krokos described the great difficulty he encountered when attempting to interview Letterlough about the night he was shot. As the investigation progressed, the Detective could not find Letterlough and since he would not contact him voluntarily, the Commonwealth issued a grand jury subpoena directing Letterlough to appear. The subpoena was ignored, a warrant issued and Letterlough was arrested.

Letterlough gave an initial interview on December 1, 2010, at which time he identified Appellant as the shooter when shown a photo array. Later, on March 11, 2011, while represented by counsel, the Commonwealth was able to finally obtain a sworn statement from Letterlough that provided [information] regarding [the] incident when he was shot.

Detective Krokos testified that Letterlough identified Appellant as the shooter within seconds of being shown the photo array containing his picture. He initialed the picture as did Detective Krokos, and the date and time were recorded along with the words "Tyrell shot Deangelo." Detective Krokos was emphatic in his testimony that Letterlough was sure about his identification, otherwise they would not have relied upon the identification for the purpose of filing charges.

In the sworn statement Letterlough again identified Appellant as the shooter. In the statement, Letterlough also stated that he had received a cellphone call from a restricted number pressuring him not to go to court in this case. Detective Krokos confirmed and the written statement evidenced that Letterlough had responded "yes" when asked, "Have you understood all my questions today?"

Courtney Slade was with Deangelo Letterlough on the night of the shooting. Slade testified at trial to knowing Letterlough as he had previously dated his sister. Slade stated that on the night of the shooting, he had met up with Letterlough on Market Street and the two of them were wandering and walking around high on drugs. At the intersection of 18th and Regina Streets, they encountered a group of men, one of whom argued with Letterlough. Slade said he was sitting on a porch when another man came running out of nowhere with a gun. He described the man as wearing shorts and a bandana. As Letterlough began running, the man with the gun chased him and, when the two were out of sight, Slade heard gunshots; however, he did not see the shooter. Based on his observations, he believed that the man who had been chasing Letterlough was the shooter.

Slade testified that, after he heard the shots, the shooter came back and put a gun to him saying "you go [sic] to give it up." A scuffle ensued, two other men jumped in and ripped a gold chain from his neck and they all struggled for the gun that had fallen to the ground. Slade got his chain back and ran to a house at 19th and Chestnut Streets while being chased by the shooter. The shooter pulled a gun on him again and shot three times. Slade was able to run away and meet up with his ride back at 18th and Chestnut as the shooter ran in a different direction.

Slade did not call police about the shooting as he said he intended on taking care of it himself. However, police interviewed him on January 12, 2011, at which time he provided a written, signed statement to Detective Krokos. In his statement to police he said that he was with Letterlough trying to diffuse the argument between him and the first man they had encountered. Police also showed him a photo array containing Appellant's picture. He identified Appellant as the shooter and circled his picture in the photo array. Despite his prior identification of Appellant as the shooter, at trial he testified that he did not see the shooter in the courtroom. He explained the change in his story by saying that, although he had been sure that Appellant was the shooter, he was no longer sure about the identification because he had recently seen someone that looked like him. In the statement, he also said that he stayed in the same area as Letterlough during his initial confrontation, but at trial he said he had moved to a porch across the street.

With respect to the changes in Slade's story, Detective Krokos testified that he had clearly explained and Slade had understood that the purpose for presenting the photo array was for Slade to identify who had robbed him and shot at him the night he was with Letterlough. He stated that Slade identified Appellant within a few seconds and the identification was verified by his own signature and that of Detective Heffner, Krokos' partner at the time. The date and time were also written on the photo array.

Trial Court Pa.R.A.P. 1925(a) Opinion, July 18, 2014 ("1925(a) Opinion"),

pp. 4-9.

Based on this evidence, the trial court determined:

The evidence presented a [sic] trial established that both victims, Letterlough and Slade, twice identified Appellant as the shooter for police. Independently, they both chose Gooding from a photo array and represented to police that they were certain as to his identity. Even though Letterlough and Slade may have later testified that [] they had become uncertain regarding the identification, Detective Krokos made clear that both victims chose Appellant's picture from the photo array within seconds of seeing it and assured him of their certainty

and understanding of the identification process. Any credibility issues are within [the] jury's purview to resolve.

Regarding the robbery charges, Letterlough and Slade unequivocally testified that, individually at different times during the incident, the perpetrator pointed a gun at them and stated "give it up," a phrase they understood to mean they were being robbed. In Slade's case, during a scuffle with the perpetrator and the other individuals on the scene, a gold chain was ripped off his neck. Then, in both instances, the perpetrator took the confrontation to a more violent level by shooting at both men. Letterlough sustained a gunshot wound to the chest. This evidence sufficiently supports the jury finding that, in the course of committing a theft, Appellant inflicted serious bodily harm upon Deangelo Letterlough and placed Courtney Slade in imminent fear of serious bodily harm.

The evidence also supports the conviction on the charge of aggravated assault. Both Letterlough and Slade testified to Appellant shooting Letterlough. There was no dispute that Letterlough was shot in the chest near vital organs of the body. Appellant's act of shooting at both individuals clearly amounts to the infliction of serious bodily injury under circumstances manifesting extreme indifference to the value of human life.

1925(a) Opinion, pp. 11-12.

The trial court did not abuse its discretion in admitting into evidence the witnesses' previously signed and/or adopted statements and photo arrays once the witnesses testified inconsistent with their previous statements at trial. Accordingly, we agree with the trial court's determination that the evidence, when viewed in the light most favorable to the Commonwealth as verdict winner, supports Appellant's robbery and

aggravated assault convictions.[7] Accordingly, Appellant's sufficiency of the evidence claim fails, and we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judge Mundy joins in the memorandum.

President Judge Gantman concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/14/2015

---

[7] We note that neither Appellant nor the trial court's 1925(a) opinion specifically address Appellant's convictions for persons not to possess firearms and firearms not to be possessed without a license. However, challenges to the sufficiency of the evidence on Appellant's firearm convictions would fail. Appellant stipulated at trial that he was not licensed to carry a firearm in the Commonwealth on July 8, 2010. **See** N.T. 12/3-5/2012, p. 254. Based on this stipulation and the identification evidence discussed **supra**, the jury found him guilty of firearms not to be possessed without a license. **Id.** at 272. Further, following the jury's verdict, Appellant pleaded guilty to persons not to possess firearms based on a prior aggravated assault conviction. **See id.** at 278-281.