J-S03044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RASEAN MALONE | |
| Appellant | No. 1549 EDA 2015 |

Appeal from the Judgment of Sentence April 27, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003070-2014

BEFORE: FORD ELLIOTT, P.J.E., OTT, J., and JENKINS, J.

MEMORANDUM BY JENKINS, J.: **FILED FEBRUARY 18, 2016**

Rasean Malone and two cohorts robbed two victims and fatally shot one of the victims, Tyrell Woodson. A jury found Malone guilty of second degree murder, attempted murder, conspiracy to commit murder, conspiracy to commit robbery, robbery, possession of an instrument of crime and carrying firearms in public.[1] The court imposed an aggregate sentence of life imprisonment without the possibility of parole plus 10-20 years' imprisonment.

Malone files this timely direct appeal from his judgment of sentence. Both Malone and the trial court complied with Pa.R.A.P. 1925. We affirm all

---

[1] 18 Pa.C.S. §§ 2502(b), 901(a), 903(c), 3701(a)(1), 907(a), and 6108, respectively.

convictions, but we vacate Malone's sentence for robbery and remand for resentencing on all other counts of conviction.

Malone raises two issues in this appeal:

1. Is [Malone] entitled to an arrest of judgment with respect to his convictions for second degree murder, attempted murder, robbery, criminal conspiracy (two counts), violation of the Uniform Firearms Act and possessing instruments of crime [where] the evidence is insufficient to sustain the verdicts of guilt as the Commonwealth failed to sustain its burden of proving [Malone's] guilt beyond a reasonable doubt?

2. [Does Malone's] separate sentence for robbery following a conviction for second degree murder violate[] double jeopardy?

Brief For Appellant, at 4.

Malone's first argument is a challenge to the sufficiency of the evidence. When examining such challenges, the standard we apply is

> whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

- 2 -

*Commonwealth v. Hansley*, 24 A.3d 410, 416 (Pa.Super.2011).

The trial court accurately summarized the evidence adduced during trial as follows:

Shortly before 2 a.m., on July 1, 2013, Hakim Parker, after leaving a friend's house, walked on Chester Avenue from 58th to 57th Street. While walking, he met up with Tyrell Woodson and another male. A short time later, Parker and Woodson left the other male and walked on Chester Avenue towards a Chinese restaurant located at 56th Street and Chester Avenue. While Parker and Woodson walked, a smoky gray-colored Hyundai Sonata, with four occupants inside, pulled up alongside them. The Hyundai's four occupants stared at Parker and Woodson for a moment and then drove off.

Soon thereafter, as Parker and Woodson walked, the Hyundai returned and cut directly in front of them. This time only the driver was inside. Approximately fifteen seconds after the Hyundai cut in front of Parker and Woodson, the three occupants who were previously in the Hyundai walked from Ithan Street onto the same side of Chester Avenue as Parker and Woodson. As Parker and Woodson walked toward the three males, the tallest of the three males stepped in front of Parker and Woodson, pointed a revolver at them, and stated, 'Don't move or I'm gonna blow your shit smooth off.' At that moment, Parker and Woodson retreated from the three males and took off running. Parker sprinted south across Chester Avenue towards Frazier Street in the direction of his home. Woodson ran in the opposite direction of Parker and turned the corner from Chester Avenue and ran northbound onto Frazier Street with the taller male with the gun chasing after him. As Parker raced home, he heard multiple gunshots.

A clock from a recovered surveillance video, which captured part of the confrontation between Parker, Woodson, and the three males, indicates that the confrontation began at or about 1:48:30 in the morning. Within five minutes of the initial confrontation, at approximately 1:52 or 1:53 a.m., police responded to a radio call for the 1600 block of Frazier Street. When police arrived at Frazier Street a short time later, they

found Tyrell Woodson lying on the ground with a gunshot wound to his head.

That same day, at 11:00 a.m., Woodson was pronounced dead at the Hospital of the University of Pennsylvania. Assistant Medical Examiner, Dr. Albert Chu, from the Philadelphia Medical Examiner's Office, testified that the manner of Woodson's death was homicide caused by a single gunshot wound to the right, backside of Woodson's head.

On October 19, 2013, police arrested Dasaahn McMillan for firearm possession. After his arrest, McMillan informed police that he was willing to speak with them in reference to the shooting death of Woodson. At the time Woodson was killed, McMillan lived with his girlfriend, Sheronda Miller, and her daughter, Raven Williams. Williams, at the time, dated [Malone].

In a statement to detectives, McMillan stated that on or around July 5, 2013, he had a conversation with [Malone] in which [Malone] described to him how he 'jumped out on somebody' a few nights before. [Malone] told McMillan that he jumped out of a car and told someone 'give that shit up or I'm going to blow your head smooth off.' Although McMillan testified at trial that he did not remember the topic of the conversation he had with [Malone] on or around July 5, 2013, McMillan did testify at trial that he remembered telling the detectives that [Malone] told him on or around this date that he had previously 'jumped out o[n] somebody.'

At some point after speaking with [Malone], McMillan spoke with Parker, whom McMillan also knew. McMillan told detectives that Parker, when describing the night Woodson was killed, told McMillan that one of the three males used the phrase 'give that shit up or I'm gonna blow y'all head smooth off.' This phrase was almost identical to the phrase [Malone] had earlier told McMillan when he described how he recently 'jumped out on somebody.'

Noticing the similarities between the two phrases, McMillan asked Parker if he recognized any of the faces of the three males who approached him the night of the shooting. McMillan informed the detectives that Parker had told McMillan that one of the males was short and had distinctive pimples with a bumpy face. At that moment, McMillan realized that Parker was referring

to [Malone], who also went by the name Shizz. In response to Parker's description of [Malone], McMillan told detectives that he exclaimed to Parker 'that's main man, bro ... [from] South Philly.' Parker asked if his name was Shizz, which McMillan confirmed it was. While McMillan could not, at trial, pinpoint the exact date of the conversation he had with Parker about the subject shooting, nor could he remember the conversation 'word for word,' he did remember having the conversation with Parker, and stated that the conversation had to be not long after Woodson was killed.

After talking to Parker, McMillan again saw [Malone]. McMillan told detectives that [Malone] told McMillan to tell 'young boy [referring to Parker] to keep my name out of his mouth. I'm going to blow his shit off.' McMillan also informed detectives that [Malone] admitted to him that he jumped out on Parker and Woodson 'just to rob them because he had got some bad dope.' McMillan explained that when [Malone] had bad dope, 'his money slowed up. He needed money. [Malone] got two daughters. I'm pretty sure he had to buy Pampers and food.'

On October 10, 2013, police detectives interviewed Parker and showed him several photographic arrays to help detectives identify the three males who had approached Parker and Woodson the night Woodson was killed. From the first photo array, Parker identified [Malone]. Parker circled, dated, and signed the photograph and wrote 'without' next to [Malone]'s name to indicate that [Malone] did not have a gun in his hand when [Malone] first approached him. In his statement to detectives, Parker stated that, of the three males who approached him that night, it was [Malone] who stood the closest to him and was directly in front of him right before the shooting.

Even though Parker maintained at trial that he did not remember telling the detectives many of the items in his earlier statement, he did confirm at trial that he looked at photo arrays with detectives on October 10, 2013. When shown the photo array at trial that included the circle he placed around [Malone]'s picture, Parker claimed that [Malone] was not his first choice. At the preliminary hearing, however, Parker identified photographs of [Malone] and Harrison as photographs he previously identified for detectives from photo arrays. He also confirmed at both the

preliminary hearing and at trial that the signature and date on said photo arrays were in his handwriting.

Although Parker informed detectives that he did not personally know [Malone], he did state that he had seen [Malone] about a month before the shooting exiting a red Pontiac Grand Prix at a nearby plaza. [Malone]'s girlfriend, Raven Williams, corroborated that [Malone] did travel with a friend who drove a red Grand Prix. McMillan also informed police that [Malone] and his friends traveled in a burgundy-colored Grand Prix.

From a second photo array presented by detectives, Parker selected William Harrison's photograph and identified Harrison as the taller male who pointed the gun at them and instructed them not to move. Next to Harrison's photograph, Parker wrote 'tall with gun' and signed and dated the photograph.

In addition to the photo arrays, police also showed Parker five still photographs taken from a surveillance that captured part of the shooting. Parker marked and identified captured imaged in each of the five stills. On the first two stills, he marked and identified himself as well as the gray–colored vehicle that cut in front of him and Woodson. On a third still, Parker marked and identified himself, Woodson, and the 'tall guy' who threatened Parker and Woodson with a gun. On a fourth still, Parker identified one of the three males and wrote on the still, 'guy facing me.' Parker confirmed that the 'guy facing me' was the same male (that is, [Malone]) that he identified from the first photo array shown to him by detectives. On the fifth still, Parker identified himself as the person retreating from the three males and running across Chester Avenue.

On the same surveillance video that detectives used to generate the still photographs, the video shows the male whom Parker identified as [Malone] reaching toward his waistband and walking towards Parker. Parker is then seen turning his back and running across Chester Avenue towards Frazier Street. At that moment, the video shows [Malone] stopping, pulling out a gun, widening his stance, aiming the gun at Parker, and then firing. The surveillance video captured two muzzle flashes from the firearm. The video also shows smoke emitting from the gun's barrel.

Five days after the murder of Woodson, on July 6, 2013, while Harrison was incarcerated on a matter unrelated to the subject crime, he made an outgoing call, which was recorded by the prison, to Patricia Myers, his girlfriend. While on the phone with Myers, Myers made a three-way call to Mitchell Spencer. During the conversation with Spencer, Spencer handed the phone to someone who identified himself as Shizz. In the conversation between Harrison and Shizz, in a likely reference to the vehicle used the night of the murder, Harrison asked Shizz, 'What's up with that ... car? You ever off that car?' Shizz responded, 'Fuck no. We in that shit right now.'

Trial Court Opinion, at 2-7.

Construed in the light most favorable to the Commonwealth, the evidence is sufficient to sustain Malone's convictions for second degree murder, attempted murder, conspiracy to commit murder, conspiracy to commit robbery, robbery, possession of an instrument of crime and carrying firearms in public. We rely in large part on the trial court's excellent analysis, which we reprint below:

A 'person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he: (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.' 18 Pa.C.S. § 903. An explicit or formal agreement to commit crimes can seldom, if ever, be proved; but a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. *Commonwealth v. Perez*, 931 A.2d 703, 708-09 (Pa.Super.2007); *Commonwealth v. Jones*, 874 A.2d 108, 121-22 (Pa.Super.2005). Once the evidence establishes the presence of a conspiracy, 'conspirators are liable for acts of coconspirators committed in furtherance of the conspiracy.' *See*

*Commonwealth v. Lambert*, 795 A.2d 1010, 1016 (Pa.Super.2002) (upholding a second-degree murder sentence where the defendant agreed to serve as a getaway driver for a man who shot two people, killing one, after breaking into a home with a gun).

A person is guilty of robbery if, in the course of committing a theft, he inflicts serious bodily injury upon another or threatens another with or intentionally puts him in fear of immediate serious bodily injury. 18 Pa.C.S.A. § 3701(A)(1) and (i). A robbery is completed when an attempt is made to take the property of another by force or threat thereof. *Commonwealth v. Thompson*, 648 A.2d 315, 319 (Pa.1994) (overturned on other grounds by *Commonwealth v. Widmer*, 744 A.2d 745 (Pa.2000)). It is thus not essential that there be an actual theft; it is sufficient that force was used during the attempted theft. *Commonwealth v. Lloyd*, 545 A.2d 890, 892 (Pa.Super.1998).

Second-degree murder consists of a 'criminal homicide committed while the defendant is engaged as a principal or an accomplice in the perpetration of a felony.' 18 Pa.C.S. § 2502(b). The perpetration of a felony is defined as '[t]he act of the defendant engaging in or being an accomplice in the commission of or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.' 18 Pa.C.S. § 2502(d). The malice essential for second-degree murder is imputed [to] a defendant from his intent to commit the underlying felony, regardless of whether a defendant actually intended to physically harm the victim. *Commonwealth v. Mikell*, 729 A.2d 566, 569 (Pa.1999). The felony-murder rule permits the fact-finder to infer the killing was malicious from the fact the [defendant] was engaged in a felony of such a dangerous nature to human life because the actor, as held to the standard of a reasonable man, knew or should have known, that death might result from the felony.' *Lambert*, 795 A.2d at 1023 (quoting *Commonwealth v. Legg*, 417 A.2d 1152 (Pa. 1980)). Second-degree murder also does not require the element of foreseeability. *Lambert*, 795 A.2d at 1023. In addition, whether a killing was in furtherance of a conspiracy is a question for the jury to decide. *Id*. It does not matter, though, whether the defendant anticipated that the victim would be killed in furtherance of the conspiracy. *Id*.

The record reflects that when the killing of Woodson took place, [Malone] was a co-conspirator in the perpetration of a robbery, an enumerated felony for second-degree murder. *See* 18 Pa.C.S.A. § 2502(d). [Malone]'s conduct demonstrates that he took part in a well-coordinated plan to rob Parker and the decedent. The scope of that plan is evidenced by the fact that after [Malone], Harrison, and the two other males stared at and targeted Parker and Woodson, they drove around the block and shortly returned. Upon their return, the driver of the Hyundai cut directly in front of Parker and Woodson to impede their path, while [Malone], Harrison, and a third male, acting in concert, approached Parker and Woodson from the street.

The surveillance video shows that after [Malone] and his co-conspirators walked onto Chester Avenue, [Malone] and Harrison spread out on the sidewalk to cut off any avenues of escape. While Harrison walked towards Woodson, [Malone] walked towards Parker. As soon as Harrison was within a few feet of Woodson, he produced a firearm and threatened Parker and Woodson with force not to move or he would 'blow [their] shit smooth off.' As Harrison threatened Parker and Woodson, [Malone] was reaching to his waist in a manner consistent with retrieving a firearm, which he produced once Parker and Woodson fled. When Parker and Woodson fled, [Malone] and Harrison reacted in unison: Harrison immediately ran after Woodson with his gun drawn while [Malone] simultaneously fired his gun at Parker.

The evidence plainly shows that the plan to rob Parker and Woodson was fully set in place before [Malone], Harrison, and the unidentified third male exited the Hyundai. [Malone], Harrison, and the two other males implemented that plan, which culminated once Harrison pointed his gun at Parker and Woodson and instructed them not to move or harm would result. At that moment, the robbery was complete. It is immaterial that there was no actual theft. *See Thompson* and *Lloyd*, *supra*.

Because [Malone]'s conduct makes it clear he was a co-conspirator for the robbery, the malice from the robbery is imputed to the killing of Woodson to make it second-degree murder. *See Lambert*, *supra*. The evidence here is more than sufficient to conclude that Woodson's death resulted from the robbery. The timing and the location of the discovery of Woodson's body indicate that Woodson was chased and killed

- 9 -

during the robbery. Within just a few minutes of the confrontation captured by the surveillance camera, police discovered Woodson's body on Frazier Street.

Further, the ballistic evidence supports Harrison as Woodson's killer. It was Harrison who first chased after Woodson when Woodson fled. Moreover, Parker identified Harrison's gun as a revolver. This same type of gun, according to Officer Norman Defields, of the Firearms Identification Unit, fired the bullet extracted from the decedent. Although it is immaterial whether [Malone] actually expected Woodson's death, the evidence here reflects that [Malone] knew, or should have known, there was a possibility of death to either Parker or Woodson when he agreed to and participated in the armed robbery. *See Lambert*, *supra*. Thus, [Malone] is culpable for Woodson's death.[2]

[Malone], however, asserts that no evidence establishes his identity as the shooter, principal, accomplice, or co-conspirator in the incident that resulted in the homicide of Woodson or the attempted murder of Parker. Although evidence of identification 'need not be positive and certain to sustain a conviction,' the evidence in the instant matter is more than sufficient to identify [Malone] as a shooter, a principle, an accomplice, or a co-conspirator in the subject crimes. *Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa.Super.2011) (quoting *Commonwealth v. Jones*, 954 A.2d 1194, 1197 (Pa.Super.2008), *appeal denied*, 962 A.2d 1196 (Pa.2008). Parker identified [Malone] from a police photographic array as one of the males who approached him the night Woodson was killed. [Malone] was not a stranger

---

[2] The same evidence that establishes [Malone's] conspiratorial liability also establishes his accomplice liability for the robbery and murder. For accomplice liability, there must be evidence that the person intended to aid or promote the underlying offense; and (2) that the person actively participated in the crime by soliciting, aiding, or agreeing to aid the principal. *Commonwealth v. Rega*, 933 A.2d 997, 1015 (Pa.2007). The evidence in the case at bar is amply sufficient for accomplice liability, as [Malone's] conduct leading up to and during the encounter with Parker and Woodson establishes that he promoted and actively participated in the robbery.

to Parker at the time of the robbery, which supports the identification's accuracy. Parker previously saw [Malone] exiting a red Grand Prix about a month before the robbery. [Malone]'s girlfriend and McMillan corroborated that [Malone] sometimes traveled in a red or burgundy Grand Prix.

In addition to the photo array identification, Parker stated that the person in the still photograph facing him, who stood the closest to him, was the same male ([Malone]) that he identified in the first photo array. The surveillance video, which the still photographs were generated from, also corroborates Parker's account of the robbery. In its charge, this Court instructed the jury pursuant to Jury Instruction 4.07(B) on the circumstances in which the jury must receive identification testimony with caution. After receiving this instruction, the jury chose to believe the identification made by Parker.

[Malone] also challenges the sufficiency of the evidence of his conviction for attempted murder. A person is guilty of attempted murder if he takes 'a substantial step towards an intentional killing.' **Commonwealth v. Wesley**, 860 A.2d 585, 593 (Pa.Super.2004); **see also** 18 Pa.C.S.A. § 901(a). If a defendant takes a 'substantial step toward the commission of a killing, with the specific intent in mind to commit such an act, he may be convicted of attempted murder.' **In re R.D.**, 44 A.3d 657, 678 (Pa.Super.2012). The 'substantial step test broadens the scope of attempt liability by concentrating on the acts [Malone] has done and does not any longer focus on the acts remaining to be done before the actual commission of the crime.' **In re R.D.**, 44 A.3d at 678 (quoting **Commonwealth v. Gilliam**, 417 A.2d 1203, 1205 (Pa.Super.1980). The Commonwealth may also solely use circumstantial evidence to establish the *mens rea* required for first-degree murder - the specific intent to kill. **In re R.D.**, 44 A.3d at 678.

Instantly, the surveillance video shows a male, whom Parker identified as [Malone], reaching towards his waistband in a manner consistent with retrieving a firearm while walking towards Parker, who [wa]s in close proximity, less than 20 feet away. After Parker turn[ed] his back and r[an], [Malone] produce[d] the firearm, widen[ed] his stance, aim[ed], and fire[d] at least two shots at Parker. Because [Malone] widen[ed] his stance and aim[ed] at Parker before firing, his actions establish that he took a substantial step towards an intentional

killing and demonstrate that he had the requisite intent to shoot and kill Parker. Thus, the evidence is sufficient to support his conviction for attempted murder.

To secure a conviction for [possession of an instrument of crime], the Commonwealth must show that [the] defendant possessed an instrument of crime with the intent to employ it criminally. 18 Pa.C.S. § 907(a). An instrument of crime is '[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.' 18 Pa.C.S. § 907(d)(2); *see also* ***Commonwealth v. Robertson***, 874 A.2d 1200, 1208-09 (Pa.Super.2005).

Here, the evidence establishes that [Malone] was engaged in the commission of a felony when he carried a handgun. The surveillance camera shows [Malone] approaching Parker and Woodson, reaching to his waistband, producing a firearm, and firing at Parker as Parker fled. As discussed above, [Malone] employed the firearm in the commission of a robbery and attempted murder. The evidence was thus sufficient to establish that [Malone] possessed a criminal instrument with the intent to employ it criminally.

[Malone] also challenges his conviction for carrying a firearm in public. In Philadelphia, 'no person shall carry a firearm, rifle, or shotgun at any time upon the public streets or upon any public property in a city of the first class unless such person is licensed to carry a firearm.' 18 Pa.C.S.A. § 6108. The surveillance video shows a male, whom Parker identified as [Malone], moving his arm, again, in a manner consistent with retrieving a firearm from his waistband. The video shows [Malone] extending his arm with the firearm in hand. After he extend[ed] his arm, muzzle flashes and smoke emanate[d] from the end of the gun's barrel. The certificate of non-licensure submitted by the Commonwealth conclusively established that [Malone] was not eligible to carry a firearm at the time of the shooting. This evidence is thus sufficient to establish [Malone] carried a firearm in public without a license.

Trial Court Opinion, at 9-15.

We supplement the trial court's analysis with two points. First, the surviving victim, Hakim Parker, gave a signed statement to the police in which he positively identified Malone as one of the three men who shot at Parker and Woodson. Parker's statement provides additional evidence of Malone's guilt. *See Commonwealth v. Ragan*, 645 A.2d 811, 817-18 (eyewitness identification of defendant as shooter sufficient to prove his guilt); *Commonwealth v. Thomas*, 539 A.2d 829, 931 (Pa.Super.1988) (single witness's positive identification of defendant sufficient to establish his identity as the robber); *Commonwealth v. Boone*, 429 A.2d 689, 691 n.2 (Pa.Super.1981) ("the testimony of one witness may suffice to establish the identification of the accused"). It is irrelevant that Parker partially recanted his signed statement at trial by claiming that his identification of Malone from a photo array was not his first choice. Parker's statement unequivocally identifying Malone as the robber and shooter was properly admitted as substantive evidence for the jury's consideration. *See Commonwealth v. Jones*, 644 A.2d 177 (Pa.Super.1994) (witness's signed statement to the police stating that he saw defendant firing shots at the victim, a statement that was inconsistent with his trial testimony, was admissible as substantive evidence at trial to prove defendant's identity as the killer); *see also Commonwealth v. Bibbs*, 970 A.2d 440, 452 (Pa.Super.2009) (witness's identification of defendant at preliminary hearing was sufficient to establish defendant's identity at trial as perpetrator,

notwithstanding fact that witness recanted that identification at trial). Therefore, we must review Parker's statement, like the other evidence, in the light most favorable to the Commonwealth. *See*, *e.g.*, *Commonwealth v. Brown*, 52 A.3d 1139, 1171 (Pa.2012) ("prior inconsistent statements, which meet the requirements for admissibility under Pennsylvania law, must, therefore, be considered by a reviewing court in the same manner as any other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction").

Second, with regard to Malone's argument that the evidence did not establish that Woodson's killing took place in the course of a felony, Malone ignores Dasaahn McMillan's statement to the police that Malone told McMillan that he (Malone) had "jumped out of [a] car" and told the victims to "give that shit up or I'm going to blow your head smooth off." McMillan also stated that Parker told him that several men had jumped out of a car and said "give that shit up or I'm gonna blow y'all head smooth off." McMillan explained that Malone admitted that he had robbed Parker and Woodson because "he needed money" as a result of someone selling him some "bad dope". This evidence was sufficient to prove that Woodson's murder took place during the robbery perpetrated by Malone and his co-conspirators.

For these reasons, we conclude that Malone's challenge to the sufficiency of the evidence is devoid of merit.

In his second argument, Malone contends that his sentence for robbery violates the constitutional prohibition against double jeopardy. We agree.

The jury found Malone guilty of Count 1 of the criminal information, second degree murder, and Count 3 of the information, robbery. Both counts listed Woodson, the decedent, as the victim. Another count of robbery in the information, Count 11, was nolle prossed. The court sentenced Malone to life imprisonment without possibility of parole on Count 1 and to a consecutive term of 10-20 years' imprisonment on Count 3.[3]

Although Malone did not raise a double jeopardy challenge in the trial court, such claims pertain to the legality of the sentence and can never be waived. *Commonwealth v. Wolfe*, 106 A.3d 800, 801 (Pa.Super.2014). We will therefore review this issue. Our standard of review for this question of law is *de novo*. *Commonwealth v. Vargas*, 947 A.2d 777, 780 (Pa.Super.2008).

The double jeopardy protection of the Fifth Amendment of the United States Constitution provides: "... nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; ..." In *Commonwealth v. Tarver*, 426 A.2d 569 (Pa.1981), our Supreme Court observed that "the constitutional prohibition of double jeopardy has been

---

[3] On all other counts of conviction, the court imposed sentences that ran concurrently with Malone's sentence on Count 1.

held to consist of three separate guarantees: (a) protection against a second prosecution for the same offense after an acquittal; (b) protection against a second prosecution for the same offense after conviction; and (c) protection against multiple punishments for the same offense." *Id*. at 571 (citations omitted). The *Tarver* court stated:

> The ... test for determining when two charges constitute the 'same offense' was first articulated by the U.S. Supreme Court in *Blockburger v. U. S.*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932): 'The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.'

*Id*. at 572. *Tarver* held:

> [U]nder the 1939 Penal Code, which was in effect at the time of this crime, it is clear that the underlying felony of robbery was a constituent offense of the felony-murder and, therefore, the 'same offense' under the terms of the *Blockburger* formulation ... [T]he 1939 Penal Code separated murder into two degrees with murder of the first degree providing for an enhanced penalty. First degree murder occurred where the killing was willful, deliberate and premeditated. It also occurred where the killing was in the perpetration of one of five enumerated felonies, one of these felonies being robbery. In this instance, the basis for the finding of murder of the first degree was the proof that the killing occurred during the course of the robbery.

*Id*. at 573-74. Subsequent to *Tarver*, in *Commonwealth v. Starks*, 450 A.2d 1363 (Pa.Super.1982), the defendant was found guilty of second degree murder under 18 Pa.C.S. § 2502 -- the same statute which the jury found Malone guilty of violating -- and robbery. The trial court imposed consecutive sentences and directed that the defendant serve his second

degree murder sentence following his robbery sentence. This Court held that in light of *Tarver*, imposition of consecutive sentences violated the Double Jeopardy Clause and remanded the case for resentencing. *Starks*, 450 A.2d at 1366. We observed:

> The *Tarver* trial involved a 1968 murder tried under the 1939 Penal Code (as amended). The instant case involves a 1979 murder tried under the 1972 Penal Code (as amended). Any differences in the definitions of 'murder of the first degree' in the 1939 statute and 'murder of the second degree' in the 1972 statute, do not affect the holding of *Tarver, supra,* or its applicability here.

*Id*.

Today, robbery remains a constituent element of second degree murder, just as it was when this Court decided *Starks*. *See* 18 Pa.C.S. §§ 2502(b) (defining second degree murder as "criminal homicide ... committed while defendant was engaged as a principal or an accomplice in the *perpetration of a felony*") and 2502(d) (defining "perpetration of a felony" as "the act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit *robbery*...") (emphasis added). Phrased in terms of the *Blockburger* test, second degree murder and robbery do not "each ... require[] proof of a fact which the other does not." *Tarver*, 426 A.2d at 572. Therefore, Malone's consecutive sentences for second degree murder and robbery violate the Double Jeopardy Clause.

The Commonwealth argues that Malone's consecutive sentences are valid under the merger statute, 42 Pa.C.S. § 9765, which prescribes in

relevant part: "No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense." Section 9765, however, codifies our Supreme Court's adoption of the **Blockburger** test in **Tarver** and **Commonwealth v. Anderson**, 650 A.2d 20 (Pa.1994). **Commonwealth v. Wade**, 33 A.3d 108, 120 (Pa.Super.2011) ("our merger statute merely codified the adoption by the **Tarver/Anderson** decisions of the **Blockburger** test and upholds the long-standing merger doctrine relative to greater and lesser-included offenses"). Consequently, where consecutive sentences violate the **Blockburger** test, as they do here, they also violate section 9765.

Accordingly, we vacate Malone's sentence for robbery as unconstitutional, and we vacate Malone's remaining sentences and remand for resentencing on all convictions other than robbery to give the trial court the opportunity to restructure its entire sentencing scheme. **Commonwealth v. Goldhammer**, 517 A.2d 1280, 1283–84 (Pa.1986); **Commonwealth v. Williams**, 871 A.2d 254, 266 (Pa.Super.2005) (if trial court errs in its sentence on one count in multi-count case, all sentences for all counts will be vacated so trial court can restructure its entire sentencing scheme).

Convictions on all counts affirmed; judgment of sentence for robbery vacated as unconstitutional; case remanded for resentencing on all other counts of conviction; jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/18/2016