J-A10037-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RONALD THOMAS | : | |
| | : | |
| Appellant | : | No. 2898 EDA 2018 |

Appeal from the Judgment of Sentence Entered September 19, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0013001-2010

BEFORE: BOWES, J., SHOGAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED JUNE 03, 2020**

Ronald Thomas (Thomas) appeals from the judgment of sentence imposed in the Court of Common Pleas of Philadelphia County (trial court) for his jury conviction of first-degree murder, possession of an instrument of crime, carrying a firearm without a license, and carrying a firearm on a public street in Philadelphia[1] after his second trial in this matter.[2] After our thorough

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(a), 907, 6106(a) and 6108, respectively.

[2] Thomas's first trial occurred in 2013. (***See Commonwealth v. Thomas***, 2015 WL 6457805 (Pa. Super. filed Oct. 2, 2015) (unreported memorandum). The Commonwealth proceeded under the theory that Thomas murdered Anwar Ashmore over drugs. On direct appeal, a panel of this Court found that the trial court (1) had improperly admitted a hearsay statement made by Ashmore to his brother about stealing drugs from Thomas, and (2) Thomas's

review, we affirm on all issues raised before the trial court and remand for a hearing on his after-discovered evidence and **Brady** claims.

On appeal, Thomas challenges the sufficiency and weight of the evidence to support his conviction "where the evidence was unreliable." (Thomas's Brief, at 3). He and the Commonwealth also request that we remand this matter for an evidentiary hearing on the after-discovered evidence of improper investigative techniques used by two of the detectives who took statements that the witnesses later recanted at trial. (**See id.** at 3, 23-46, 49-54); (Commonwealth's Brief, at 17-22). He also alleges that the Commonwealth committed a **Brady**[3] violation for failing to disclose the information sooner.[4] (Thomas's Brief, at 46-49).

---

rap lyrics about a drug theft and retaliatory murder. This was the only evidence connecting Thomas to the sale of illegal drugs and providing him with a motive to kill Ashmore. (**See id.** at *7). We concluded that the only other evidence provided by the Commonwealth, the testimony of witnesses who recanted or changed their testimony, did not provide such overwhelming evidence of Thomas's guilt "that the erroneously admitted evidence could not have contributed to the verdict." (**Id.**). On this basis, we vacated and remanded for a new trial.

[3] **Brady v. Maryland**, 373 U.S. 83 (1963).

[4] Thomas also argues that prior appellate counsel failed to raise certain claims and evidentiary issues in his Rule 1925(b) statement, thus waiving them and depriving Thomas appellate review. (**See** Thomas's Brief, at 3, 23, 25-26). However, any claims of ineffective assistance of counsel cannot be raised in a direct appeal but must await collateral review. **See Commonwealth v. Crosby**, 844 A.2d 1271, 1271-72 (Pa. Super. 2004).

**I.**

We take the following background from our independent review of the certified record. The charges against Thomas relate to his shooting and murder of Anwar Ashmore (Ashmore).

Ashmore was fatally shot in the chest at the corner of North Stanley and West Huntindon Streets in Philadelphia at approximately 9:00 P.M. on the evening of April 22, 2010. He suffered injuries to his sternum, heart, ribs, lungs and left arm. When Philadelphia Police Officers William Forbes and Anthony Ricci arrived on the scene moments later, a group of people was standing around him as he gasped for air. Ashmore was unable to answer the officers' questions and the bystanders denied having heard anything. (*See id.* at 105-08). Ashmore was pronounced dead at Temple University Hospital moments after arriving. The cause of death was two gunshot wounds to the chest, later determined to be from a .45 caliber handgun.

Approximately one hour after the shooting, Detectives Philip Nordo, Tracy Byard, Thorsten Lucke and Billy Golphin[5] arrived at the scene. The police did not locate any eyewitnesses to the murder that night. However, one month later, on May 22, 2010, they arrested Raphael Spearman three blocks from the murder scene after a police chase. He was in possession of a

---

[5] Detective Golphin was an officer at the time.

.45 caliber handgun that was later determined to be the gun that fired the bullets that killed Ashmore.  (***See*** N.T. Trial, 9/17/18, at 54, 221; N.T. Trial, 9/18/18, at 76, 143).  Over the ensuing days and months, Troy Devlin, Jeffrey Jones, Raphael Spearman and Kaheem Brown identified Thomas as Ashmore's killer.  Detective Nordo took the statements of Devlin, Jones and Spearman.  Detective Williams took Brown's statement.

## II.

## A.

Trial commenced on September 11, 2018.  The Commonwealth proceeded under the theory that Thomas murdered Ashmore in retaliation for the shooting of his associate, Kaheem "Bay" Brown, approximately five months earlier.  At trial, the Commonwealth presented Devlin, Jones, Spearman and Brown, each of whom identified Thomas as the shooter in their police statements, but then recanted at trial.  Specifically, the following occurred.

### 1. Troy Devlin

At trial, Devlin was a reluctant witness who stated that he did not want to be there, could not remember anything about the murder or the argument preceding it, or even the day of the murder.  When confronted about his prior statement to Detectives Nordo and Byard, he identified the signatures on the statement and photos of Thomas and others as his, but maintained that he could not remember giving the statement and that he could only remember

4

back to 2017 because of a seizure disorder he had been diagnosed with in 2002. When questioned about Detective Nordo, Devlin claimed he did not know him and had not been contacted by him since he gave his statement. (**See** N.T. Trial, 9/13/18, at 40, 53-54, 57-60, 63-86, 92, 94-95).

Detective Byard read the transcript of Devlin's police statement, which he had provided to Detectives Nordo and Byard on April 24, 2010, into evidence. Devlin had stated that on the night of the murder, he was standing on the corner with Thomas, Anwar Ashmore, Dennis Williams, Raphael Spearman, Kaheem Brown, Jeffrey Jones, Rodney Smith and Darren Hainesworth. He said that the men argued about whether they should retaliate against another neighborhood group for shooting Brown several months earlier. Thomas wanted to retaliate, but Ashmore and Jones did not, and Ashmore explained that he had approached the group responsible for Brown's shooting and handled the issue. Thomas accused Ashmore of not wanting to be in their group anymore. According to Devlin's police statement, when Ashmore walked away to sell drugs to someone, everyone started walking away from Thomas and he shot Ashmore two times. (**See** N.T. Trial, 9/14/18, at 19-26).

Detective Byard testified that Devlin provided each answer and signed the statement without coercion. He maintained that no one told Devlin to identify Thomas as Ashmore's killer and that no promises were made in exchange for his statement. (**See id.** at 28-29, 33).

5

## 2. Jeffrey Jones

At trial, Jones denied being present at Ashmore's murder and claimed that he heard about Ashmore's death the following day. When confronted with his prior statement to the police, Jones maintained that he did not "personally give the statement," but that the "statement was presented to [him] by the homicide detectives." (N.T. Trial, 9/13/18, at 132). He testified that the detectives knew he had fled from probation and told him that if he signed the statement, they would give him money to help him and his family move and not report him to his probation officer. (*See id.* at 132, 138). Jones said that at the time he gave the statement, he was coming off a PCP high and was only thinking of himself, doing what they asked him to do so that he could leave. He denied providing any of the statement's answers. (*See id.* at 132-35, 137, 147-65).

Detective Byard read Jones's statement to the detectives into evidence. (*See* N.T. Trial, 9/14/18, at 39-44). Jones was taken into police custody on August 23, 2010, and the detectives waited to interview him until the next day because Jones was high on PCP at the time. (*See id.* at 35). Jones's statement mirrored Devlin's in all pertinent respects, including the identity of the individuals present before the murder, the argument preceding it, and the number of shots Thomas fired at Ashmore. (*See* N.T. Trial, 9/13/18, at 137; N.T. Trial, 9/14/18, at 35-44, 52-53).

6

According to his testimony, Detective Byard was present for the entire time that Jones was giving his statement and he did not appear to be under the influence of drugs or alcohol. (*See* N.T. Trial, 9/14/18, at 35). The detective stated that he did not tell Jones anything Devlin had told him during his statement or share any other evidence with him. (*See id.*). He maintained that the detectives neither suggested any of the answers to the interview questions nor made any promises in exchange for him providing them. (*See id.* at 37). Finally, Detective Byard testified that he observed Jones review and sign the statement. (*See id.* at 44).

*3. Raphael Spearman*

When called to testify, Spearman refused to leave his cell, walk to the witness stand or acknowledge his name on the record. (*See* N.T. Trial, 9/14/18, at 80-81). He refused to respond to the trial court's questions and was found in contempt four times, resulting in an aggregate sentence of not less than one nor more than two years' imprisonment. (*See id.* at 81-89, 91). Eventually, the trial court found him unavailable and that his testimony from Thomas's 2013 trial and his police statement could be read into the record. (*See* N.T. Trial, 9/17/18, at 21-23).

The 2013 testimony described a different version of events than that provided by any other witness or in either of Spearman's police statement or in his testimony at Thomas's preliminary hearing. In 2013, Spearman testified that he was standing on the corner opposite Dennis Williams and Ashmore

when the two men started arguing. No other individuals were present. Spearman said that he approached the two men for a cigarette lighter to diffuse the situation. Williams gave him the lighter and asked him if he had his gun. Spearman answered that he did, and when he took it out to show it off, Ashmore reached for it, saying he wanted to see it. Williams pushed Spearman's arm away twice, telling him not to give the gun to Ashmore. Spearman claimed that this motion caused his cigarette to burn his hand, resulting in him accidentally pulling the trigger and shooting Ashmore once in the chest. He maintained that as Ashmore stumbled away, Williams grabbed the gun and shot Ashmore twice more. (*See id.* at 32-42). He then hid the gun in his house. (*See id.*).

When asked about his police statement in which Spearman had identified Thomas as the shooter, Spearman claimed that he lied to the police because he knew Thomas already was charged with the murder and because the detectives had advised him that if he did not provide the statement, he and his friends would be charged with murder. (*See id.* at 61, 73-74). He maintained that he was not read his rights before giving the statement, which he said he made up with "a little coerc[ion] by detectives." He also testified that he did not know that other individuals had given statements before he provided his to the detectives. (*See id.* at 64; N.T. Trial, 9/18/18, at 34).

Spearman said he did not confess at the preliminary hearing because he was about to make bail in his own criminal case, but that because he felt

8

guilty, he eventually confessed at the 2013 trial. (**See** N.T. Trial, 9/17/18, at 114, 116-18). He also claimed that he had not wanted to get Williams in trouble by implicating him in Ashmore's murder. However, Williams was killed by the time of the 2013 trial, which was when Spearman claimed for the first time that he and Williams shot Ashmore. (**See id.** at 175, 181, 203-04).

At the 2018 trial, Detective Golphin read Spearman's August 5, 2010 statement given to him and Detective Nordo. (**See** N.T. Trial, 9/18/18, at 107-13). In his statement, Spearman told the detectives that on the night of the murder, he was standing on the corner across from a group of people that included Thomas and Ashmore when he saw Thomas pull out a gun and shoot Ashmore. He said that after the shooting, he and everyone else started running away and when he got down the block and around the corner, Thomas confronted him, handed him a bag containing the .45 handgun and told him to hide it. Spearman stated that he kept the firearm in his basement until May 22, 2010, the day he was caught carrying it in public. He maintained that Thomas never asked him about the gun. (**See id.**).

Detective Golphin testified that he was present for Detective Nordo's entire interview of Spearman, that Spearman was advised of his rights and signed them, and that he did not share any information given to detectives in earlier statements or any other evidence with Spearman. (**See id.** at 98-99, 103-04). He stated that the detectives did not make any promises or use any

9

coercion to induce Spearman to sign the statement and that he witnessed Spearman review and sign it. (*See id.* at 98-99, 104-07, 113-18).

The Commonwealth presented evidence of Spearman's possible intimidation. After Spearman's preliminary hearing on the gun charge, a group of inmates attacked him and stabbed him with a pen while he was waiting to be transported back to jail. In a phone call with his brother several days later, Spearman told him that Thomas told other inmates that he was cooperating with the police. (*See* N.T. Trial, 9/17/18, at 125-26, 131). Two weeks later, he mailed a letter to Thomas's attorney, confessing that he committed the murder alone and that he was intoxicated at the time he provided a statement to detectives implicating Thomas. (*See id.* at 179-80). However, he later told an investigator for Thomas's attorney that he sent the correspondence because someone had slipped him a threatening letter in jail ordering him to do so. He told the investigator that he knew nothing about the murder and only signed the police statement because the detectives told him Thomas was the shooter and promised to dismiss his gun charge in exchange. (*See id.* at 187-90).

### 4. Kaheem Brown

When called to testify at trial, Brown immediately stated, "I don't know nothin'." (N.T. Trial, 9/12/18, at 5). He maintained that he could not remember anything from 2010. When confronted with his prior statement to

police, he testified that he did not recognize it or remember providing the answers therein. (*See* N.T. Trial, 9/12/18, at 5, 35-61).

Brown was asked about his 2013 trial testimony in which he had claimed that he was not present at the shooting and had heard about it at home shortly after it happened. (*See id.* at 79-80). He also stated that police officers picked him up two weeks after the shooting and denied him access to his mother or a lawyer prior to questioning despite him having asked for both. (*See id.* at 87). He claimed the detectives had tortured him into signing the statement by beating him with their hands, prodding at his old bullet wounds, and attempting to burn him with a lit cigarette. (*See id.* at 93). When asked about this prior testimony, Brown maintained that he could not remember giving any of it and did not remember the detectives torturing him. (*See id.* at 143).

Detective Peters read the transcript of Brown's police statement into evidence. (*See* N.T. Trial, 9/18/18, at 156-61). In it, Brown stated that on the night of Ashmore's murder, he was on the corner across the street from David Williams and the same individuals identified by Devlin and Jones in their statements. He said that he saw Thomas pull out a "dirty" black gun and shoot Ashmore. Brown then ran home. (*See id.*).

Detective Peters testified that Brown agreed to be interviewed before he gave his August 31, 2010 police statement to him and Detective Williams and that he did not ask for either his mother or a lawyer. (*See id.* at 149). The

11

detective denied that Brown was beaten or forced into signing the statement, identifying a photograph of himself and Brown casually reviewing it. (*See id.* at 151, 171). Finally, he stated that no evidence was provided, no answers were suggested and Brown signed the statement in his presence. (*See id.* at 154, 165-66).

The Commonwealth provided evidence of Brown's possible intimidation. Specifically, shortly after Brown gave police his statement, it was posted around the neighborhood in stores and on telephone poles. (*See* N.T. Trial, 9/12/18, at 211). Months later, a man put a gun to Brown's mother's head at a local laundromat, pulling the trigger twice. The gun did not go off and the man fled. (*See id.* at 195-97). Approximately a week later, four bullets were fired at Brown's home, shattering a picture and lodging in the front hall. (*See id.* at 209-10).

On September 19, 2018, at the conclusion of trial, the jury convicted Thomas of first-degree murder and related charges. The court sentenced him to an aggregate term of life imprisonment. Thomas timely appealed. He and the court have complied with Rule 1925(a). *See* Pa.R.A.P. 1925.

**B.**

*Detectives Nordo and Williams*

On September 5, 2018, the Commonwealth filed a Motion *in Limine* to Preclude Reference to Detective Nordo's Alleged Misconduct on the basis that such evidence was hearsay, irrelevant and collateral. *(See Commonwealth's*

*Motion in Limine*, 9/05/18, at 5). More specifically, the Commonwealth maintained that, although the detective had since been fired by the Philadelphia Police Department for his misconduct, his actions occurred approximately five years after his interrogations in this case, none of the allegations involved Thomas's case, no criminal charges had been filed, and the Commonwealth did not intend to call him as a witness. (**See id.** at 3). Therefore, the Commonwealth argued, Detective Nordo's misconduct was a collateral issue. (**See id.** at 4) (citing cases). The court granted the motion the same day.

Neither Detective Nordo nor Detective Williams testified at trial. At the time of trial, Detective Nordo had been dismissed from the Philadelphia Police Department for allegedly putting money in prison inmates' commissary accounts and improperly communicating with witnesses and defendants outside of his official duties. There was no evidence of misconduct by Detective Williams at that time.

Since Thomas's trial, the Commonwealth has filed criminal charges against Detectives Nordo and Williams premised on their alleged misconduct in the investigation of crimes and use of police resources and has vacated the judgment of sentence and conviction in other cases based on Detective Nordo's misconduct. (**See** Thomas's Brief, at 39-40). It has provided Thomas with related discovery. On April 22, 2019, Thomas filed a motion for remand to allow the trial court to conduct an evidentiary hearing based on this newly

provided evidence.[6]   This Court denied the motion *per curiam*, without prejudice to Thomas bringing the issue up with this merits panel.  (***See*** *Per Curiam* Order, 5/17/19).

### 1. Detective Nordo

Since the conclusion of his trial, the Commonwealth has provided Thomas with information about Detective Nordo's role in an unrelated murder case, ***Commonwealth v. Powell***, No. CP-51-CR-0006915-2015.  In ***Powell***, the trial court dismissed all charges after "new and uniquely troubling information" about Detective Nordo's investigative techniques were revealed at a pretrial hearing on Powell's motion to dismiss.  (Commonwealth's Brief, at 14).[7]

At the hearing, the evidence showed that Detective Nordo made phone calls and unauthorized visits to incarcerated witnesses and deposited money into their prison accounts.  He also had unauthorized contact with a judge without the District Attorney's knowledge and sought pretrial release of an incarcerated witness.  He lied about whether he had prior relationships with

---

[6] On January 24, 2019, this Court granted a motion for remand for a hearing regarding Nordo's alleged misconduct in ***Commonwealth v. McCoy***, No. 598 EDA 2017.

[7] We rely on the Commonwealth's description of the evidence it provided to Thomas because it is not part of the record.  (***See*** Commonwealth's Brief, at 14-16).

witnesses he claimed only to have met during his investigation of Powell and his co-defendant. One of the witnesses could be heard on recorded prison phone calls telling Detective Nordo that he loves him and calling him "Coach." Nordo was unavailable for Powell's pretrial hearing because Nordo's attorney stated that Nordo would assert his Fifth Amendment privilege against self-incrimination.

Further, Detective Nordo took a statement from a person who was under the influence of illegal narcotics and suggested everything that ultimately was said in the statement. That statement alluded to another conversation between the individual and the detectives that was not recorded. The detective had kept Powell's co-defendant in custody for seventeen hours before taking his written statement.

The Commonwealth also disclosed to Thomas a grand jury report that detailed Detective Nordo's coercive interrogation techniques, including threatening individuals with prosecution, intimidating individuals into signing false statements and giving people cash rewards for providing fabricated statements. The disclosure included multiple indictments that charged Detective Nordo with coercive sex crimes related to his interrogation of suspects and witnesses. (*See* Commonwealth's Brief, at 16).

### 2. Detective Williams

Detective Nathan Williams was arrested in November 2019 and charged with tampering with public records, unsworn falsification to authorities,

tampering with or fabricating physical evidence, and obstructing the administration of law. Since that time, the Commonwealth provided Thomas with certain related disclosures pursuant to its practice. Those disclosures included information from an internal investigation report showing that Detective Williams used police database records to find personal information about a woman that his cousin had been harassing and send the woman's personal information to his cousin, and then lying, attempting to conceal his misconduct from internal investigators. (**See id.**).

### III.

On appeal, Thomas argues that the verdict was against the sufficiency and weight of the evidence because it was "inherently unreliable" due to the eyewitness's recantations and the contradictory versions of events. (**See** Thomas's Brief, at 3, 13-22). He also requests that we remand this case for an evidentiary hearing about the newly-disclosed evidence of the misconduct of Detectives Nordo and Williams in their interrogation techniques and alleges that the Commonwealth committed a **Brady** violation by failing to disclose this information sooner. (**See id.** at 36-37, 46-54). The Commonwealth agrees that remand is appropriate. It maintains "[b]ecause the[] eyewitnesses subsequently recanted, their out-of-court statements constituted the only evidence that [Thomas] was responsible for the victim's killing, [and] the Commonwealth cannot maintain confidence in [Thomas's] conviction absent an evidentiary hearing focused on exploring the potential

16

misconduct in this case." (Commonwealth's Brief, at 17). Now to the Thomas sufficiency[8] and weight[9] of the evidence challenges.

## A.

We address Thomas's sufficiency of the evidence claim first.[10] Thomas maintains that the testimony of the eyewitnesses, the only evidence linking

---

[8] As we explain in more detail later in this decision, we are remanding this case for the trial court to consider Thomas's after-discovered evidence and *Brady* claims in the first instance. We consider his sufficiency claim because, if the evidence was insufficient, then the appropriate remedy would be to discharge his conviction, making remand for consideration of those issues unnecessary. *See, e.g.*, *Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013) (*en banc*), *appeal denied*, 80 A.3d 777 (Pa. 2013) ("Because a successful sufficiency of the evidence claim warrants discharge on the pertinent crime, we must address this issue first.") (citation omitted).

[9] Thomas failed to preserve his weight of the evidence issue in a post-sentence motion thereby waiving. *See* Pa.R.Crim.P. 607(A); *Commonwealth v. Jones*, 191 A.3d 830, 834-35 (Pa. Super. 2018). However, in the interest of judicial economy, we will consider the issue.

[10] "Our standard of review is *de novo* and our scope of review is limited to considering the evidence of record, and all reasonable inferences arising therefrom, viewed in the light most favorable to the Commonwealth as the verdict winner." *Commonwealth v. Rushing*, 99 A.3d 416, 420-21 (Pa. 2014) (citations omitted). The factfinder is free to believe all, some or none of the evidence, and determine its credibility. *See Commonwealth v. Mack*, 850 A.2d 690, 693 (Pa. Super. 2004). The factfinder resolves any doubt as to the facts and circumstances the Commonwealth establishes unless they are "so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances." *Commonwealth v. Taylor*, 831 A.2d 661, 663 (Pa. Super. 2003) (citation omitted). We do not reweigh evidence or substitute our judgment for that of the factfinder. *See Commonwealth v. Mitchell*, 902 A.2d 430, 449 (Pa. 2006).

him to the crime, "was inherently unreliable" where it was contradictory and the witnesses recanted their police statements.[11] (Thomas's Brief, at 21; **see id.** at 13-22).[12]

### 1. Recantation testimony

Recantation occurs with some frequency in the criminal context. Where its witness recants, the Commonwealth can rely on prior inconsistent statements that are "demonstrably reliable and trustworthy" as substantive evidence. **Commonwealth v. Grimes**, 648 A.2d 538, 546 (Pa. Super. 1994), *appeal quashed*, 670 A.2d 642 (Pa. 1995). The Commonwealth may use a prior inconsistent statement as substantive evidence if it is "a contemporaneous, verbatim recording of a witness's statement, and that recording is either electronic, audiotaped or videotaped, or where the

---

[11] We agree with Thomas's observation that in his appeal of the 2013 conviction, this Court found that the recanted testimony did not provide such overwhelming evidence that the erroneously admitted evidence could not have contributed to the verdict. (**See** Thomas's Brief, at 13); (**see also Thomas**, **supra** at *7). However, the Commonwealth was proceeding under a different theory, *i.e.*, that Thomas murdered the victim over a drug dispute, and there was no evidence linking Thomas to the drug trade other than the improperly admitted hearsay and rap lyrics. (**See Thomas**, **supra** at *7). Here, the Commonwealth's theory was that Thomas shot Ashmore in retaliation for an earlier killing, something each of the witnesses had stated. Therefore, our holding in that appeal has no bearing on the argument here.

[12] Thomas misapprehends our standard of review. Much of his argument on this issue is a restatement of the witnesses' testimony in the light most favorable to him. (**See** Thomas's Brief, at 14-21).

18

statement was given under oath at a formal legal proceeding, or where the statement is reduced to a writing signed and adopted by the declarant." *Commonwealth v. Bibbs*, 970 A.2d 440, 448 (Pa. Super. 2009), *appeal denied*, 982 A.2d 1227 (Pa. 2009) (citation omitted). Importantly, such out-of-court statements, even where inconsistent, are sufficient to sustain a conviction. *See, e.g.*, *Commonwealth v. Brown*, 52 A.3d 1139, 1171 (Pa. 2012) (out-of-court statements of three recanting witnesses sufficient to sustain verdict where statements were "fundamentally consistent with one another in recounting the same narrative of the manner in which the shooting transpired.").

Here, the statements, while recanted, were taken contemporaneously to the witnesses speaking with police and signed by each of them, satisfying the criteria of *Bibbs*. Hence, they were properly admitted, and it was for the jury to determine the credibility and weight to be given to them in light of the witnesses' recantations and allegations of coercion.

### *2. Sufficiency*

Evidence is deemed to be sufficient where it establishes all elements of the crime charged. In this case, the Commonwealth charged Thomas with first-degree homicide, possessing an instrument of crime, carrying a firearm on a public street or public property in Philadelphia and firearms not to be carried without a license.

To prove first-degree murder, the Commonwealth must establish that a person was unlawfully killed by the defendant with malice and specific intent to kill. *See **Commonwealth v. Padilla***, 80 A.3d 1238, 1244 (Pa. 2013), *cert. denied*, 573 U.S. 907 (2014); 18 Pa.C.S. §§ 2501, 2502(a). There is no required period of reflection and the defendant can form the specific intent to kill in the fraction of a second. *See **Commonwealth v. Fisher***, 769 A.2d 1116, 1124 (Pa. 2001), *cert. denied*, 535 U.S. 906 (2002). Indeed, shooting the victim in the general area of a vital organ is enough evidence of malice and specific intent to support a conviction for murder in the first degree. ***See Commonwealth v. Predmore***, 199 A.3d 925, 933 (Pa. Super. 2018), *appeal denied*, 208 A.3d 459 (Pa. 2019).

Pursuant to the Crimes Code, to establish possession of an instrument of crime, the Commonwealth must prove that the defendant "possess[ed] any instrument of crime with the intent to employ it criminally." 18 Pa.C.S. § 907. It is beyond peradventure that a gun can be an instrument of crime. Finally, carrying a concealed firearm outside of one's abode or place of business without a license and carrying a firearm on a public street in Philadelphia are prohibited by the Crimes Code. ***See*** 18 Pa.C.S. §§ 6106(a)(1), 6108.

In this case, the record reflects that in his statement to police, every witness identified Thomas as the individual who possessed a gun on the street in Philadelphia and that he fatally shot Ashmore multiple times. Ashmore sustained injuries to vital organs, including his sternum, heart, ribs and lungs.

20

This evidence was sufficient to establish that Thomas possessed an instrument of crime on his person in Philadelphia and that he used it to unlawfully kill Ashmore with specific intent. Although these statements were later recanted by the witnesses, as stated above, prior inconsistent statements can be sufficient to establish a crime and it was for the jury to determine the credibility of the witnesses and the weight to be accorded their testimony. Therefore, Thomas's challenge to the sufficiency of the evidence fails.

**B.**

Next, we turn to Thomas's claim that the verdict was against the weight of the evidence.[13] Thomas argues that the lower court abused its discretion in relying on the witnesses' police statements, not their trial testimony. He maintains that "[t]hey were all either offered inducements to implicate Mr. Thomas or were threatened with being charged with this crime." (Thomas's Brief, at 23). Additionally, he maintains that Spearman's admission to the

---

[13] Our review of a weight claim is a review of the trial court's exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence." **Commonwealth v. Sebolka**, 205 A.3d 329, 341 (Pa. Super. 2019) (citation omitted). We cannot substitute our judgment for that of the factfinder, and will only reverse a trial court's ruling in this regard where the verdict is so contrary to the evidence that it shocks our sense of justice. **See Commonwealth v. Johnson**, 668 A.2d 97, 101 (Pa. 1995), *cert. denied*, 519 U.S. 827 (1996).

21

homicide and possession of the murder weapon and the lack of fingerprints or DNA evidence weigh in favor of granting a new trial. (***See id.*** at 22-23).

The trial court found that the verdict was not against the weight of the evidence where the witnesses identified Thomas as the shooter in signed written statements. As we noted in our review of Thomas's sufficiency of the evidence claim, it was for the jury to determine what weight to give the evidence, including the witnesses' recantations, their claims of threats and inducements, and Spearman's admission. Because there is record support for the jury's determination, we will not reweigh the evidence or determine its credibility. Further, the record does not reflect that the trial court overrode or misapplied the law or that the judgment the court exercised was manifestly unreasonable or the result of partiality, prejudice, bias or ill-will. ***See Commonwealth v. Davido***, 106 A.3d 611, 64 (Pa. 2014). Therefore, we decline to find that the trial court abused its discretion in denying Thomas's weight of the evidence challenge and this claim fails. ***See Johnson***, ***supra*** at 101; ***Sebolka***, ***supra*** at 341.

## C.

*After-Discovered Evidence and Brady*

Finally, both Thomas and the Commonwealth ask that we remand this case for the trial court to hold a hearing on the after-discovered evidence of Detectives Nordo's and Williams's interrogation techniques. (***See*** Thomas's Brief, at 36-46, 49-55); (Commonwealth's Brief, at 17-22). Thomas also

alleges a **Brady** violation against the Commonwealth for failing to provide this information sooner because the prosecutor had a duty to know about the investigation of Detectives Nordo and Williams in other cases.[14] (**See id.** at 46-49).

"A post-sentence motion for a new trial on the ground of after-discovered evidence must be filed in writing promptly after such discovery." Pa.R.Crim.P. 720(C). The Comment to Rule 720 explains that "after-discovered evidence discovered during the direct appeal process must be raised promptly during the direct appeal process, and should include a request for a remand to the trial judge[.]" Pa.R.Crim.P. 720(C), Comment.

To obtain relief on a claim of after-discovered evidence, the evidence must satisfy a four-prong test:

> (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely.

**Commonwealth v. Rivera**, 939 A.2d 355, 359 (Pa. Super. 2007), *appeal denied*, 958 A.2d 1047 (Pa. 2008) (citation omitted).

---

[14] The Commonwealth maintains that the **Brady** claim is waived for Thomas's failure to raise it in his Rule 1925(b) statement. (**See** Commonwealth's Brief, at 18 n.4); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."). While generally, this is true, under the unique circumstances of this case, and to allow the trial court and parties the opportunity to fully develop the record on this issue, we decline to find waiver.

The United States Supreme Court held in **Brady** "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." **Brady**, **supra** at 87. This duty to disclose evidence is applicable even where the defendant has not made a request for it. **See Strickler v. Greene**, 527 U.S. 263, 280 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." **Id.** (citations omitted). This rule includes evidence known only to police investigators, but not the prosecutor, who has a duty to learn of any evidence known by others who are acting on behalf of the Commonwealth in the defendant's case. **See id.**

Here, the Commonwealth provided Thomas with evidence of the "uniquely disturbing allegations of the detectives' misconduct." (Commonwealth's Brief, at 22). Based on both parties' recitation of the facts, the police were aware of some of this alleged misconduct in other cases during and prior to Thomas's trial, although no criminal charges had been filed at that time. However, what is not known is whether this misconduct occurred at the police interrogations in this case, which, if it did, would certainly affect the outcome of the trial, where the evidence tying Thomas to the crime were the recanted police statements of the eyewitnesses. Based on the information provided by the parties, we remand to provide the trial court the opportunity

to develop the record and to rule upon Appellant's after-discovered evidence and **Brady** claims in the first instance. **See Rivera**, **supra**, at 358–59; Pa.R.A.P. 302(a) ("Issues not raised in the lower court . . . cannot be raised for the first time on appeal."); Pa.R.Crim.P. 720(C), Comment.

Verdict affirmed. Judgment of sentence vacated. Application for Remand granted. Case remanded for further proceedings consistent with this decision. Jurisdiction relinquished.

Judge Bowes joins the memorandum.

Judge Shogan concurs in the result.


*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 6/3/2020*