J-S13001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : IN THE SUPERIOR COURT OF |
| | :         PENNSYLVANIA |
| | : |
| v. | : |
| | : |
| | : |
| ARNON HILL | : |
| | : |
| Appellant | : No. 1590 EDA 2025 |

Appeal from the Judgment of Sentence Entered May 7, 2025
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0004633-2023

BEFORE: PANELLA, P.J.E., NICHOLS, J., and KING, J.

MEMORANDUM BY PANELLA, P.J.E.:         **FILED JUNE 23, 2026**

Arnon Hill appeals from the judgment of sentence entered in the Delaware County Court of Common Pleas on May 7, 2025. Additionally, Hill's court-appointed counsel seeks to withdraw pursuant to ***Anders v. California***, 386 U.S. 738 (1967). We affirm the judgment of sentence and grant counsel permission to withdraw.

On September 6, 2023, Hill was arrested following an incident where he "pistol whipped" his girlfriend after dragging her around his apartment complex at gunpoint, banging on other residents' doors, and accusing her of cheating on him with them.

On November 1, 2023, a criminal information was filed charging Hill with Counts 1 and 2—aggravated assault, Count 3—possession of firearm prohibited, Counts 4 and 5—simple assault, Count 6—possession of an

instrument of crime ("PIC"), Counts 7 and 8—terroristic threats, Count 9—unlawful restraint, Counts 10 and 11—recklessly endangering another person, and Count 12 and 13—harassement.[1] After consideration of Hill's motion to quash bills of information, the court granted the motion, thereby quashing Counts 2, 5, 8, and 11, as to an unnamed victim.

At trial, the jury heard the grisly and disturbing details of the night of the assault. The victim testified that, in September 2023, she had known Hill for a few months, and assented that their relationship could be described as "boyfriend and girlfriend." N.T., 2/19/25, at 44. However, she had been planning to end things with Hill. *See id.* at 47. On the night in question, she was at her sister's home in Philadelphia, and Hill was calling and texting the victim. While she ignored him at first, she ended up leaving with him because "he was saying he was going to kick my sister's door in." *Id.* at 48. They then went to Hill's apartment in Delaware County. *See id.* at 48-49. The victim described Hill's apartment as just one room, with a bed, a dresser and a little kitchen area. *See id.* at 49.

When they got to Hill's apartment, the victim wanted to take a shower. *See id.* at 49. Hill did not have any soap in his room, so he went to his car to look for some soap. *See id.* at 52. In the meantime, the victim already got

_____

[1] 18 Pa.C.S.A. § 2702(a)(1); 18 Pa.C.S.A. § 6105(a)(1); 18 Pa.C.S.A. § 2701(a)(1); 18 Pa.C.S.A. § 907(a); 18 Pa.C.S.A. § 2706(a)(1); 18 Pa.C.S.A. § 2902(a)(1); 18 Pa.C.S.A. § 2705; 18 Pa.C.S.A. § 2709(a)(1), respectively.

undressed. ***See id.*** However, when Hill could not find any soap, the victim decided to just go to bed since she had work in the morning. ***See id.*** The victim then took her towel off, with her back turned towards Hill. ***See id.*** at 53. The victim testified that when she turned around, Hill was holding a gun in her face. ***See id.*** At that time, Hill was also undressed. ***See id.*** at 99-100. She described the gun as gray with a bunch of rubber bands on the handle. ***See id.*** The victim had seen the gun a few times before, stating it "was something he carried []." ***Id.*** The victim identified the gun shown in court as Hill's gun, and indicated the rubber bands were familiar to her, and confirmed she had seen the same gun in Hill's possession "a lot of times." ***Id.*** at 56.

When Hill put the gun in the victim's face, he told the victim to "[g]o to the apartment of the dude that [she was] fucking in the apartment." ***Id.*** at 54. The victim was confused, as she had only been to the apartment complex one other time, and did not know anyone else in the building. ***See id.*** at 51, 54. Because she did not know where Hill wanted her to go she felt stuck. ***See id.*** at 56. She walked towards the door, at which point Hill was behind her with the gun. ***See id.*** Hill nudged her in the back of the head to open the door. ***See id.*** at 57. They then left the apartment and started walking down the hallway, while the victim was still naked. ***See id.*** Hill kicked in the door to the first apartment, but no one was there. ***See id.*** at 58. At the next apartment, while the gun was still pointed at the victim's face, Hill started knocking on the door, and said that she better hope that the guy has the same answer

(meaning that the neighbor better not know the victim) or "we're both done." *Id.* The victim took that statement to mean that she was going to die at that time. *Id.* at 59. Someone answered the door and immediately closed and locked it. *See id.* at 61-62. The victim did not know that person. *See id.* at 62.

The victim then got away from Hill and started knocking on every door down the hall, but no one came out to help. *See id.* at 64. The victim then got stuck in the corner of the hallway, and sat down there as her "legs just gave out under" her. *Id.* at 65. Hill came over with the gun and told her to get up, but when she did not get up, Hill hit her hard on the side of her head with the side of the gun. *See id.* at 65-67. Hill again asked her to get up, and when she did not, he told her to open her mouth and he put the barrel of the gun in her mouth. *See id.* at 67-68. While he had the gun in her mouth, Hill said he would blow her brains out. *See id.* at 69. Hill then took the gun out of her mouth and told her to get up again. *See id.* at 70. The victim did not get up, explaining that she could not because her body was numb from being so scared. *See id.* Hill then hit her in the forehead with the butt of his gun. *See id.* The victim then got up because she did not want to be hit again or shot. *See id.* at 72. Hill then started dragging her back towards his room. *See id.* Hill told her to open the door to his apartment. *See id.* at 73. She did not open the door, and then ran away when she heard the cops arrive. *See id.* at

73-74. Hill still had the gun when they got back to his apartment door, but the victim did not know what he did after she ran away. *See id.*

Charles Holmes, a resident in the same building, then testified. Holmes did not want to testify and had called the Commonwealth multiple times asking if he was necessary for the case and if he had to show up. *See id.* at 133-34. He was told he could be locked up or held in contempt if he did not appear. *See id.* at 134. Holmes rented a room in the same building as Hill and was home alone on the night in question. *See id.* at 135-36. A knock on his door woke him up from sleeping. *See id.* at 137. He got up to see who was at the door, opened the door, and then shut the door when he "seen there was someone that shouldn't have been at my door." *Id.* at 137-38. When asked why he said the person "shouldn't have been there," Holmes just said "I didn't have a reason. I don't know who the person was, so why would I stand at the door if I didn't know who the person was." *Id.* at 138. Holmes said there was only one person at the door and contended he did not remember what they were wearing. *See id.* at 139-140. After getting back up and seeing that the person was still outside his door, Holmes called 911. *See id.* at 140. When asked why, if the person was not doing anything, he closed the door and did not speak to him, Holmes said he was intoxicated. *See id.* at 141; *see also id.* at 145.

When the Commonwealth showed Holmes a handwritten statement that he gave to police on the night of the incident, Holmes stated he did not

recognize it. *See id.* at 147. However, Holmes acknowledged that all the personal information contained in the statement was his, including his name, age, phone number, and social security number. *See id*. at 149. When asked if it was his signature at the bottom, Holmes stated "I mean, it's a scribble scrap, but I guess." *Id.*

When Holmes was asked to read the answers in the statement, he read "Man came to my door to approach about a girl." *Id.* at 150. Although he confirmed the statement was in his handwriting, he claimed he could not read the handwriting. *Id.*

The Commonwealth then requested to treat Holmes as a hostile witness. *See id.* at 152. After Holmes continued to contend he could not read the statement, and stated he lied in the statement about the person at his door having a gun, *see id.* at 155-67, the court allowed the Commonwealth to treat Holmes as a hostile witness. *See id.* at 168 ("It is clear he's a hostile witness. He can treat him as a hostile witness."). The Commonwealth thereafter asked Holmes leading questions about his statement to police and the ways in which it differed from his trial testimony. *See id.* at 169-84.

Next, Officer Bryce McElhiney testified that he was on duty working as a patrolman on the night in question. *See id.* at 197. Officer McElhiney was dispatched via an emergency tone, "which usually means something, a priority is coming out for a domestic with a weapon …". *Id.* at 199. Officer McElhiney also testified that they received a call about a naked male with a gun. *See id.*

at 202. When Officer McElhiney got to the property, he went upstairs and observed the victim and Hill, who were both naked, standing in the hallway with other officers. *See id.* Officer McElhiney was told to detain Hill. *See id.* at 204. Since Hill was naked, Officer McElhiney went with Hill into his room so he could put clothes on. *See id.* Once they were in the room, Hill put his shorts on, but then "wouldn't fully put the shirt on, was kind of maybe wasting time." *Id.* Officer McElhiney was asked by another officer to grab an article of clothing for the victim. *See id.* at 204-05. Officer McElhiney picked up clothing off the bed and observed a firearm underneath that piece of clothing on the bed. *See id.* at 205. Officer McElhiney then put Hill in handcuffs. *See id.* When asked how far the bed was from the door, Officer McElhiney testified that "[y]ou could probably stick your foot out and touch it from the doorway." *Id.* Officer McElhiney described the gun as a small handgun that was black and gray with rubber bands wrapped around. *See id.* at 206. The Commonwealth then played video from Officer McElhiney's body-worn camera, and after watching the video, Officer McElhiney confirmed the video showed that neither he nor Hill opened the door to Hill's room, and that the door had already been open when they entered. *See id.* at 213.

Finally, the Commonwealth called an employee from the correctional facility, and played a phone call made by Hill while he was incarcerated pre-trial. We acknowledge the contents of the call are not clear from the trial transcript. *See id.* at 246-49. However, according to closing arguments, Hill

- 7 -

acknowledged in the call that he pistol-whipped and beat up the victim because she was disrespecting him by having sex with other men. **See** N.T., 2/20/25, at 44, 46, 53.

On February 20, 2025, following a three-day trial, a jury found Hill guilty of Count 4–simple assault, Count 6–PIC, Count 7–terroristic threats, and Count 9–unlawful restraint. The jury found Hill not guilty of Count 1–aggravated assault. On the verdict sheet, the jury responded "yes" to an interrogatory as to whether they found beyond a reasonable doubt that Hill possessed a firearm on the date in question. Based on the jury's affirmative response to that question, the trial court entered a bench verdict of guilty to Count 3–possession of firearm prohibited.

On May 7, 2025, the trial court sentenced Hill to an aggregate term of 136 to 272 months' incarceration. Hill filed a post-sentence motion, which the court denied. Trial counsel then filed the instant timely notice of appeal on Hill's behalf. Trial counsel was subsequently permitted to withdraw and current appellate counsel thereafter entered his appearance. After receiving an extension of time to file a concise statement, counsel filed a statement of intent to file an **Anders** brief. **See** Pa.R.A.P. 1925(c)(4). Counsel has since filed an **Anders** brief along with a motion to withdraw as counsel.

We turn first to counsel's petition to withdraw. To withdraw pursuant to **Anders**, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has

determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citation omitted). With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." *Commonwealth v. Millisock*, 873 A.2d 748, 752 (Pa. Super. 2005).

An *Anders* brief must comply with the following requirements:

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009). "[I]f counsel's petition and brief satisfy *Anders*, we will then undertake our own review of the appeal to determine if it is wholly frivolous." *Commonwealth v. Wrecks*, 931 A.2d 717, 721 (Pa. Super. 2007) (brackets added, citation omitted).

We find counsel has substantially complied with the preliminary requirements set forth in *Anders*. Counsel filed a petition to withdraw, certifying he has reviewed the case and determined that Hill's appeal is frivolous. Counsel also filed a brief, which includes a summary of the history

and facts of the case, potential issues that could be raised by Hill, and counsel's assessment of why those issues are meritless, with citations to relevant legal authority. Finally, counsel provided a copy of the **Anders** brief to Hill and notified him that he has the right to retain new counsel in pursuit of his appeal or proceed *pro se* and that he has the right to submit any additional issues he believes are meritorious. Hill has not filed a response. As counsel has substantially complied with the dictates of **Anders** and its progeny, we will conduct an independent review of the record to determine if the appeal is wholly frivolous.

The **Anders** brief first presents a potential challenge to the sufficiency of the evidence. "Because evidentiary sufficiency is a question of law, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Johnson**, 236 A.3d 1141, 1152 (Pa. Super. 2020) (*en banc*) (citation omitted).

> When reviewing a challenge to the sufficiency of the evidence, we must determine whether, when viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence presented at trial and all reasonable inferences derived from the evidence was sufficient to establish [each element] of the offense beyond a reasonable doubt. The Commonwealth may sustain its burden entirely by circumstantial evidence. Moreover, the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part or none of the evidence.

**Commonwealth v. McIntyre**, 333 A.3d 417, 432 (Pa. Super. 2025) (citations omitted). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a

- 10 -

matter of law no probability of fact may be drawn from the combined circumstances." ***Commonwealth v. Mead***, 326 A.3d 1006, 1012 (Pa. Super. 2024) (citation omitted).

Counsel raises potential sufficiency challenges to the possession charges; namely, whether there was sufficient evidence to support the charges of possession of firearm prohibited and PIC, "where the Commonwealth failed to prove [Hill] was in possession of the firearm in question." ***Anders*** Brief, at 10.

To sustain a conviction for possession of firearm prohibited under Section 6105(a)(1), "the Commonwealth must prove beyond a reasonable doubt that the defendant [(1)] possessed a firearm and [(2) was previously] convicted of an enumerated offense that prohibits him from possessing … a firearm." ***Commonwealth v. Batty***, 169 A.3d 70, 76 (Pa. Super. 2017) (citation omitted).

Meanwhile, for PIC the Commonwealth must establish two elements: "(1) possession of an object that is an instrument of crime and (2) intent to use the object for a criminal purpose." ***Commonwealth v. Moore***, 263 A.3d 1193, 1205 (Pa. Super. 2021) (citation omitted).

The sole element Hill disputes in his sufficiency challenge to both charges is possession of the firearm. The Commonwealth can establish the element of possession by proving actual or constructive possession. ***See McIntyre***, 333 A.3d at 432. Because the firearm at issue was not recovered

from Hill's person, but rather from his bed, "the concept of constructive possession applies." *Muhammad*, 289 A.3d at 1091.

> When there is no direct evidence [that] the person was in physical possession of the firearm, the Commonwealth must prove the element of possession through what has been described as the legal fiction of constructive possession. This Court has stated that a defendant has constructive possession of contraband if he has conscious dominion of it, that is, he has the power to control the contraband and the intent to exercise that control. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not, and may be established by the totality of the circumstances[.]

*McIntyre*, 333 A.3d at 432 (citations, quotation marks, and brackets omitted). "[A]s with any other element of a crime, constructive possession may be proven by circumstantial evidence." *Muhammad*, 289 A.3d at 1091 (citation omitted).

> A defendant's mere presence at a place where contraband is found or secreted is insufficient, standing alone, to prove that he exercised dominion and control over those items. Thus, the location and proximity of an actor to the contraband alone is not conclusive of guilt. Rather, knowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession.
>
> If the only inference that the fact finder can make from the facts is a suspicion of possession, the Commonwealth has failed to prove constructive possession. It is well settled that facts giving rise to mere association, suspicion[,] or conjecture[] will not make out a case of constructive possession.

*Commonwealth v. Wright*, 255 A.3d 542, 553 (Pa. Super. 2021) (quotation marks, brackets, and citations omitted).

- 12 -

Viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, we conclude that the Commonwealth adduced sufficient evidence from which the jury could reasonably infer Hill had constructive possession of a firearm. Witness testimony shows that Hill was seen with the gun in his hands; the door to Hill's room was already open when the police arrived; and Hill was proximately located to the gun found on his bed, which was close enough to the open door to reach a foot out and touch it. The totality of these circumstances was sufficient to establish that Hill constructively possessed the firearm. **See McIntyre**, 333 A.3d at 432. Therefore, the Commonwealth presented sufficient evidence to prove, beyond a reasonable doubt, that Hill possessed the firearm for purposes of sustaining his convictions under Sections 6105(a)(1) and 907(a). Accordingly, the sufficiency challenge would fail.

Next, counsel raises a potential challenge to the court's discretion in allowing the Commonwealth to treat Holmes as a hostile witness under Pennsylvania Rule of Evidence 611. At trial, trial counsel maintained that Holmes was answering to the best of his ability, and was not refusing to answer questions. **See** N.T., 2/19/25, at 152.

A trial court has "wide discretion in controlling the use of leading questions," and this Court will not reverse "on appeal absent an abuse of discretion." **Commonwealth v. Bibbs**, 970 A.2d 440, 453 (Pa. Super. 2009)

(quoting **Commonwealth v. Lambert**, 765 A.2d 306, 360 (Pa. Super. 2000)).

Generally, under Rule 611, a party should not use leading questions on direct examination unless the witness is a hostile witness, an adverse party, or a witness identified with an adverse party:

> (c) Leading Questions. Leading questions should not be used on direct or redirect examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions:
>
> (1) on cross-examination; and
>
> (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party. A witness so examined should usually be interrogated by all other parties as to whom the witness is not hostile or adverse as if under redirect examination.

Pa.R.E. 611(c).

A party may properly be allowed to treat a witness as hostile if the witness "evidenced [an] overt unwillingness to testify and ... belligerence on the stand." **Bibbs**, 970 A.2d at 453. In other words, a "hostile" witness is one "who shows himself or herself so adverse to answering questions, whatever the source of the antagonism, that leading questions may be used to press the questions home." **Lambert**, 765 A.2d at 357 n.42 (citation omitted).

The trial court did not abuse its discretion in allowing the Commonwealth to treat Holmes as a hostile witness. Holmes made it very clear he did not want to testify and was uncooperative on the stand, refusing to actually answer questions and repeatedly claiming he could not read his own

- 14 -

handwriting and that he did not remember events. The record shows that Holmes was not open to reviewing his prior statements to the police. He continuously made up excuses for not reviewing the original statement. He first contended that he could not remember giving the statement, and subsequently contended he could not read his own handwriting in the statement. *See* N.T., 2/19/25, at 147-150. He claimed he was intoxicated when he gave the statement, and insinuated that was why he could not read the statement, and why the statement differed vastly from his in-court testimony. *See id.* at 141; *see also id.* at 145. Finally, he stated he lied in the written statement. *See id.* at 155-67.

As Holmes was unwilling to answer any of the Commonwealth's questions to the extent that he gave a statement to police on the date of the incident in which he stated Hill had a gun, the trial court appropriately allowed the Commonwealth to treat Holmes as a hostile witness. Accordingly, the Commonwealth was permitted to ask leading questions based on Holmes' signed statement during its direct examination.

Having reviewed the issues raised in counsel's *Anders* brief, and after conducting our own independent review of the record, we agree with counsel that the within appeal is wholly frivolous. As such, we affirm the judgment of sentence and grant counsel leave to withdraw.

Judgment of sentence affirmed. Petition for leave to withdraw granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>6/23/2026</u>